Docket No. 104723.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. LEWIS JACKSON, Appellee.

*Opinion filed January 23, 2009.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Kilbride, Garman, and Burke concurred in the judgment and opinion.

## OPINION

At issue is whether defendant, Lewis Jackson, was denied a fair trial by the admission of evidence that his deoxyribonucleic acid (DNA) profile was contained in a state database. We agree with the State, petitioner herein, that he was not. Further, we reject defendant's claims on cross-appeal that the trial court erred in denying his motion to quash arrest and suppress statements and that the evidence presented at trial was insufficient to prove him guilty of first degree murder beyond a reasonable doubt.

## BACKGROUND

A jury in the circuit court of Cook County found defendant guilty of the first degree murder of his aunt, Doris Jackson, and additionally

found that the murder resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty and had been committed during the course of an armed robbery. The trial court sentenced defendant to an extended term of natural life in prison. Defendant appealed and the appellate court held, *inter alia*, that while the evidence presented at trial was very close, it was sufficient to establish defendant's guilt beyond a reasonable doubt, and that police had probable cause to arrest defendant, affirming the trial court's denial of defendant's motion to suppress. 372 Ill. App. 3d 112, 120-21. However, the appellate court reversed defendant's conviction and remanded for a new trial, holding that the admission of an evidence technician's testimony regarding a DNA database was error, as it tended to suggest that defendant had committed other crimes, depriving him of a fair trial. 372 Ill. App. 3d at 124.

The following compilation of facts was gleaned from the common law record, the transcript of the hearing on defendant's motion to quash arrest and suppress evidence and the trial transcript and is presented in, approximately, chronological order. Doris Jackson (the victim) lived in a building for senior citizens in Harvey, Illinois. The victim had lived in the building since she had suffered a stroke which left her paralyzed on her right side and impaired her ability to speak. Defendant, who had been kicked out of his mother's house, had been living with the victim for several weeks at the time of her murder. The lobby of the victim's building was only accessible with a key and the door to each apartment in the building locked automatically when it was closed. However, a person without a key could gain access to the lobby if someone inside let that person in. Each tenant was issued two keys to the front door of the building, two apartment door keys, one mailbox key and one storage room key. The victim and her ex-husband, defendant's uncle Lewis Jackson (Lewis), each possessed a front door and an apartment key.

On November 1, 1995, Lewis picked up the victim from her apartment, took her to cash her public aid check and to pay her bills, took her to lunch and dropped her off at her apartment. Generally, after paying her bills, the victim was left with about $100 cash, which she would keep in her bra. However, Lewis did not see the victim place any money in her bra that day. The following morning, November 2, 1995, at about 7 o'clock, the victim's daughter,

Cassandra Jackson (Cassandra), telephoned the victim but received no answer. Cassandra was not concerned because the victim often went down to her building's recreation room to get coffee in the morning. That morning at around 7 or 7:30 a.m., the victim's across-the-hall neighbor Kenneth Jackson (Kenneth) saw the victim in the recreation room. Gwen Alexander, another resident of the building, met with the victim every morning, but did not see her on November 2, although she saw defendant in the elevator that morning. Around 9 or 10 a.m., the building's maintenance man, Willie Stewart, was vacuuming in the lobby when defendant entered the building, asked if the mail had arrived and opened the victim's mailbox. Though Stewart did not recall seeing defendant use keys, Stewart concluded that defendant would have had to use keys in order to gain access to the building and the mailbox.

That afternoon, at about 3 o'clock, Cassandra went to the victim's apartment building. Because Cassandra did not have a key to enter the lobby of the victim's building, she rang the victim's apartment but received no answer and left. At around 3:30 p.m., Kenneth saw defendant in the hallway outside the victim's apartment. Defendant walked away from the apartment toward the stairs. Kenneth did not see keys in defendant's hand and did not see blood on defendant's clothes. Between 3:30 and 4 p.m., Stewart and his friend John Simms were outside the building when a man Stewart identified as defendant, but whom Simms could not identify, came out of the building and asked them for a ride to a currency exchange. They refused defendant's request and offer of $20 and saw him use a key to reenter the building. Cassandra returned to the building at about 6 p.m. and, after ringing the victim's apartment and receiving no response, rang Stewart's apartment. Stewart used his keys to let Cassandra into the building and into the victim's apartment, where they found the victim dead in a puddle of blood on her bedroom floor. Cassandra noticed that a television was missing from the living room and another was missing from the bedroom. Stewart called the police.

At some time before 7 p.m., Detective John Rizzi of the Harvey police department arrived at the victim's apartment, and Illinois State Police crime scene investigator Jill Rizz, known as Lieutenant Jill Hill (Hill) at the time of trial, arrived shortly thereafter. Hill walked through each room of the apartment taking notes,

measurements and photographs. From the bedroom, Hill collected two bloodstained pillowcases, two bloodstained bedsheets, a broken knife blade discovered under a pillow on the bed, a small metal rivet that was consistent with the handle of a knife, a bloodstained yellow jacket and a baseball hat. Hill observed blood on the floor of the bedroom which indicated movement after the victim's blood had been shed, and that the victim had suffered multiple stab wounds to her hands, arms and chest area. In photographing the bathroom, Hill observed the toilet seat up and blood on the inside of the toilet bowl above the water line. She also observed drops of blood on the toilet rim, floor, and sink and a streak of blood on the side of the bathtub, and collected a swab of blood from both the toilet rim and the side of the bathtub. She also collected a blood-soaked dollar bill from the bathroom floor. Hill observed that the pattern of dust on a table in the kitchen and on a dresser in the bedroom was consistent with Cassandra's assertion that two televisions had been removed from the apartment. There was no sign of forced entry to the victim's apartment. No keys or money, other than the blood-soaked dollar bill, were found in the apartment; however, a purse hanging on a doorknob in the apartment was not searched.

While at the apartment building, Rizzi spoke with Cassandra and asked if she could meet him at the police station. She agreed and told Rizzi that defendant had been staying with the victim. She also gave Rizzi the name and phone number of the victim's ex-husband, Lewis Jackson, whom Rizzi called and asked to come to the police department to talk with him. Rizzi spoke to several tenants of the apartment building, including Kenneth, whom he asked to meet him at the police department. Rizzi and Hill returned to the police station, where Rizzi spoke individually with Cassandra, Lewis, and Kenneth. Cassandra told Rizzi that defendant was a crack cocaine user, and that he and Doris sometimes argued over money. She then described her attempts to see her mother that day. Lewis described his outing with the victim the previous day, and stated he had the extra set of keys to the victim's apartment. Kenneth told Rizzi about his contacts with the victim and defendant that day.

Lewis, Cassandra, and her husband, Shannon Frazier, then returned to the victim's apartment. While they were cleaning the apartment, Cassandra and Frazier heard keys jingling and saw the

door to the apartment crack open. Frazier went to the door and saw defendant walking away. Frazier called out to defendant and he came back to the apartment. Frazier did not notice any cuts on defendant's hands at that time. Lewis then told defendant that "somebody killed your Aunt Doris." Defendant's immediate response was, "I didn't do it." Lewis told defendant that the police wanted to talk to him and, around 1 a.m. on November 3, Frazier drove defendant to the police station. When they arrived, defendant went to the bathroom. He was then taken into an interview room with Rizzi. Frazier went into the bathroom after defendant and found a set of keys, which he recognized as the victim's, sitting in the wastebasket. He then called Cassandra, told her about the keys, and returned to the victim's apartment.

In the interview room, Rizzi advised defendant of his *Miranda* rights and noticed, as defendant was initialing a form regarding those rights, that defendant had cuts on the palms of both of his hands. After speaking with defendant for 10 minutes, Rizzi was called by the desk clerk and advised that Cassandra had telephoned to say that defendant had hidden something in the garbage can near the men's bathroom. Rizzi went to the bathroom and recovered a set of keys from the wastebasket and set them on his desk. Rizzi then returned to the interview room. Defendant told Rizzi that he had last seen the victim on November 1 and had returned to her apartment at 10 a.m. on November 2. At that time, defendant could not get into the apartment because it was locked, so defendant went to his friend Clarence Douglas' apartment, which was also in the building, and "got high" with Douglas and a woman named Joan. Defendant and Joan then went to the area of 159th Street and Carrs Avenue until 1 a.m. November 3, when he returned to the apartment. Defendant acknowledged that he was aware that the victim kept her money in her bra. Defendant could not recall where he had gotten the cuts on his hands and agreed to allow them to be photographed. Rizzi took six pictures of defendant's hands, placed him under arrest and took him to the police station lockup.

Back at the victim's apartment, Lewis, Cassandra and Frazier found a shirt, a pair of jeans, and a washcloth on and in the clothes hamper in the bathroom that were damp and appeared to have blood on them. Lewis and Frazier brought the clothes to the police station

and turned them over to Rizzi in the early morning hours of November 3. Cassandra noticed that there was dishwashing liquid in the bathroom, which she thought was unusual, as the victim always kept the dishwashing liquid in the kitchen. Cassandra also found a plain white envelope with a bloody palm print on it in the victim's bedroom, but rather than turn it over to police, she later gave it to her aunt, defendant's mother. In a conversation near the time of the victim's funeral, defendant told Cassandra that he had torn up the envelope.

Rizzi and Hill attended the victim's autopsy around 8 a.m. on November 3 at the medical examiner's office. The autopsy revealed that the victim had been stabbed 30 times. She sustained 17 defensive stab wounds to her arms and hands. These wounds, along with hemorrhaging to her forehead and leg, indicated that the victim had struggled. Of the 13 wounds the victim sustained to her torso, two went through her lungs and heart, breaking her ribs, and were likely to have been immediately fatal. In addition to two broken ribs, the victim sustained a broken bone in her arm and a broken bone in her hand. The cause of death was multiple stab wounds. The time of death was placed sometime on the morning of November 2, based on the fact that the victim's bladder was empty, indicating that she did not live very long after urinating. In addition, the only thing inside the victim's stomach was a small amount of brown liquid which could have been coffee. Following the autopsy, Hill collected and took to her lab a sample of the victim's blood and fingernails, vaginal, anal and oral swabs, and pieces of the victim's arm, finger and rib bones. She gave Rizzi the victim's dress, bra and socks, which he inventoried the next day. Rizzi also inventoried the keys that were recovered from the police station bathroom, the photographs of defendant's hands and the clothing found in the victim's apartment. On either November 3 or 4, 1995, officers took the keys recovered from the police station bathroom to Stewart, who identified them through the building's key code book as the victim's keys.

At 4 p.m. on November 3, 1995, after advising him again of his *Miranda* rights, Rizzi had a second conversation with defendant. Rizzi confronted defendant about the victim's money and defendant stated that he did not need money because he had just cashed a $99

-6-

unemployment check. Defendant denied that the keys recovered from the station bathroom belonged to him. Defendant stated that on November 1 at 11 p.m. he was at Popeye's restaurant and then went to Douglas' apartment, where he stayed until 2 a.m. on November 2. Defendant then met a man in a gray Chrysler and got high. Defendant returned to the victim's apartment at 3 a.m. and found the door unlocked. He retrieved his jacket from the apartment but did not see the victim. He then proceeded to get high with the man in the gray Chrysler again and returned to the victim's apartment at 10 a.m. on November 2 to find the door locked. Defendant spent the rest of the day getting high at Douglas' apartment and at 159th Street and Carrs Avenue. He returned to the victim's apartment at 1 a.m. on November 3 and found his family members in the apartment.

On the following day, November 4, 1995, at around 5:30 p.m., Assistant State's Attorney Frank Cece spoke with defendant after advising him of his *Miranda* rights. Cece noticed a cut on defendant's right palm during this interview. In this, the first of their four conversations, defendant related to Cece that he had returned to the victim's apartment at 10 a.m. on November 2, after being out all night, to find the apartment door locked. Defendant then went to Douglas' apartment, until around 2 p.m., when he went with a woman named Joan to the area of 158th Street and Carrs Avenue, where he drank alcohol and got high with several friends. At 1 a.m. on November 3, defendant returned to the victim's apartment and was told the police wanted to talk to him. Cece spoke with defendant a second time around 10 p.m. on the evening of November 4, 1995, after advising him of his *Miranda* rights. Defendant stated that he had left the victim's apartment at 11 p.m. on November 1 to go to Popeye's restaurant and then to Douglas' apartment, where he drank alcohol and got high. At 2 a.m. on November 2, defendant returned to the victim's apartment, which was unlocked, and retrieved his jacket but did not see the victim. He then went to an area of Harvey called the Village, located at 154th Street and Claremont, and to Mackey's Lounge at 159th Street and Dixie. At 3 a.m. he left the lounge and ended up "scoring drugs" and getting high with a man in a car until 4 a.m. on November 2. When defendant returned to the victim's apartment, around 10 a.m., he found the door locked, so he went back to Douglas' apartment until 2 p.m. Defendant then related

the same story about Joan, partying in the area of 158th Street and Carrs Avenue and returning to the victim's apartment at 1 a.m. on November 3 to find his family members cleaning up the apartment. When Cece confronted defendant with the allegation that money from the victim's public aid check which she usually secreted in her bra was missing, defendant stated that he did not need money because he had just cashed an unemployment check at the currency exchange.

On the afternoon of November 5, 1995, at defendant's request, Cece had a third conversation with defendant after informing him of his *Miranda* rights. Defendant stated that at 9 or 10 a.m. on November 2, he went to the victim's apartment and discovered that a television was missing and that the victim was on the floor in the bedroom in a puddle of blood. Cece confronted defendant with the fact that the police had found blood in the bathroom, a bloody dollar bill, and a knife blade and that defendant had a cut on his hand. Defendant stated that he touched the victim and tried to roll her over, then panicked and immediately washed the blood off his hands in the bathroom sink. He then left the apartment, leaving the door unlocked, went for a walk, then returned to Douglas' apartment for a short time around 11 a.m. He went back to the victim's apartment and again saw her lying on the floor. Not knowing what to do, defendant stayed at the victim's apartment for 20 or 30 minutes, went back to the Village, and then to Douglas' apartment. Defendant returned to the victim's apartment at 1 a.m. on November 3 and saw his family members there.

After speaking with Charles Douglas and Kenneth Jackson, Cece had a fourth conversation with defendant around 9:30 or 10 p.m. on November 5, after advising him of his *Miranda* rights. Upon confronting defendant with information that he had been seen coming out of the victim's apartment early on the morning of November 2, defendant stated that he had been at Douglas' apartment drinking alcohol and smoking crack cocaine from 11 p.m. on November 1 until the early morning of November 2. Sometime after daylight, defendant returned to the victim's apartment, where he "blacked out" in the living room. He did not know for how long he blacked out. When defendant woke up, he saw that the victim had been murdered and that there was blood everywhere. Defendant

touched the victim then washed the blood from his hands with a washcloth and towel in the bathroom. Defendant then changed from blue jeans and a black T-shirt to white pants and a white T-shirt and left the victim's apartment, leaving the door unlocked, and going to Clarence's apartment. Later he returned to the victim's apartment, and after staring at the victim without knowing what to do, he took the victim's keys and left the apartment, locking the door behind him. Defendant returned to Douglas' apartment, went with Joan to cash his $99 unemployment check and then to Carrs Avenue to "party." Defendant stated that he might have touched the bloodstained dollar bill recovered from the bathroom.

After Cece's final conversation with defendant ended, Rizzi requested that first degree murder charges be filed against defendant. But, following Cece's consultation with his supervisor, no approval was given. Cece then advised Rizzi to continue the investigation by locating individuals to confirm defendant's whereabouts and by conducting forensic tests on the blood evidence. Defendant was released on the night of November 5, 1995. After defendant's release, Rizzi remained on the case for another month before going on medical leave for one year. In December 1995, forensic biology expert Jeanna Dufresne Walock of the Illinois State Police Forensic Science Center tested several items recovered from the scene, including the knife blade, the dollar bill and the swabs from the toilet and bathtub, and found that each tested positive for the presence of human blood. Walock sent a report to Rizzi informing him that she wanted a sample from a suspect to compare to her findings and that no further testing would be done without one, but she never received a response.

When Rizzi returned from medical leave, he was assigned to the patrol division at his request and was never reassigned to the Doris Jackson murder investigation. Several years later, in 2001, Detective J.D. Thomas asked Rizzi to help locate the evidence he had inventoried when the case was first investigated in 1995. Rizzi found the case file in the bottom of a closet in the detective division. When Rizzi looked in the file, he noticed that some of the reports and the notes he had made were not there and that only one of the six pictures that he had taken of defendant's hands was still in the file. That photograph showed the top of defendant's right hand. He could

not locate the keys or any of the clothes recovered from the victim or her apartment.

In May 2001, forensic DNA expert Lyle Boicken of the Illinois State Police Crime Lab received a request from an assistant State's Attorney to conduct DNA analysis on the evidence collected in investigating the victim's homicide. Beginning on August 7, 2001, Boicken compared the DNA profiles he had developed from the two stains on the knife blade, a stain from the dollar bill, the fingernail clippings from both of the victim's hands, and five sections of the bed sheet to the DNA profile he had developed from the victim's blood standard, and determined that they were consistent. However, the DNA profiles developed from the stain on the bathtub and the toilet bowl were not consistent with the victim's DNA profile and the gender of these profiles was male. When those two profiles were uploaded into a computer database, Boicken obtained a match which gave him a reference number he relayed in a call to the database or "codus" administrator in Springfield. That administrator looked up the reference number of the "hit" or match, and it was determined to be defendant.

Also in August 2001, defendant called Cassandra in Orlando, Florida, and told her that he thought the police had reopened her mother's case. Defendant asked Cassandra if she would testify for him if he needed her to, and told her that he would pay for her plane ticket, but did not ask Cassandra to lie or tell her what testimony to give. Defendant told Cassandra that "just when he was doing fine, his past come [sic] back to haunt him." On August 30, 2001, Cassandra notified the Harvey police department about defendant's phone call, and after determining the address from which defendant's call was placed, he was arrested later that day. In November 2001, a swab was taken from defendant's mouth cavity and Boicken later confirmed that the DNA profile from this buccal swab was consistent with the DNA profile of the blood found on the toilet bowl and bathtub in the victim's apartment.

In the trial court, defendant challenged the admissibility of his statements made after his 1995 arrest, arguing that he was arrested without probable cause. The court found that, given the totality of the circumstances, Rizzi had probable cause to arrest defendant and his statements made thereafter were, therefore, admissible.

-10-

Defendant also filed a motion *in limine* to preclude any evidence of his 1998 conviction for criminal sexual assault, which had required him to submit a DNA sample to be placed in a database. At the hearing on the motion, the State argued to the trial court, *inter alia*, that it would be presenting testimony from DNA expert Boicken limited to the following facts: Boicken tested the material from the crime scene, did not have defendant's sample at the time, placed the sample into a DNA database and received a "hit." Defense counsel argued, *inter alia*, that reference to the "Nicodas [*sic*] Bank" opened the door for the jurors to speculate as to why defendant's DNA was "on record." At the hearing's conclusion, the trial court ruled: "Regarding the DNA sample issue, I will allow the State to present the evidence in the matter that it came from a database, but nothing further. No explanation of how the database occurred, et cetera. I think it's probably the least offensive way to deal with this issue \*\*\*."

The case proceeded to a jury trial, after which defendant was found guilty of first degree murder. The jury additionally found that the murder resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty and had been committed during the course of an armed robbery. The court sentenced defendant to natural life in prison. Defendant appealed and, as noted, the appellate court reversed his conviction and remanded for a new trial. We granted the State's petition for leave to appeal (210 Ill. 2d R. 315(a)), and defendant requested cross-relief (210 Ill. 2d R. 315(h)).

ANALYSIS

The State argues before this court that the appellate court erred in holding that defendant was denied a fair trial where evidence implying that defendant had previously been convicted of a crime prejudiced the jury against him. Specifically, the appellate court found reversible error in testimony by DNA expert Boicken as to the procedures he used in conducting forensic testing of blood sample evidence recovered from the victim's apartment. 372 Ill. App. 3d at 123-24. Of relevance is the following colloquy between the prosecutor and Boicken:

"Q. Did you develop a DNA profile from that stain from the toilet bowl?

A. Yes, I did.

Q. Was that profile consistent with the DNA profile of Doris Jackson?

A. No, it was not.

Q. Were you able to determine the gender of the profile from the stains that did not match Doris Jackson, those being from the toilet and the tub?

A. Yes.

Q. And was that a male or female profile?

A. Male.

Q. And what did you do with that profile from the tub and the toilet?

A. The profiles were uploaded into what is called a data base.

Q. And did you get any results from putting that profile into a data base?

A. Yes. I ended up obtaining a match.

Q. And did that match give you the name of any particular person?

A. It gave me a reference number from which I would need to call down to Springfield and give to the codus [sic] administrator, the data base administrator, and they would look up the reference number to who it hit to.

Q. What was the name of that person?

A. Lewis Jackson.

Q. And again, I don't think I asked this question, but did the stain from the tub and the stain from the toilet bowl, were those the same DNA profile?

A. Yes.

Q. After you got the results from the computer data base, what did you do? Did you telephone anyone?

-12-

A. I telephoned codus [*sic*] data base administrator in Springfield.

Q. When you got the match did you contact the State's Attorney's Office?

A. Yes, I did.

Q. Did you request anything?

A. I requested an additional standard from Lewis Jackson.

Q. An additional standard like a buccal swab?

A. Correct."

The appellate court further held that evidence that defendant's DNA profile, contained in the database, matched the blood found on the toilet and bathtub was cumulative, given Boicken's testimony that a buccal swab obtained directly from defendant showed that the blood found on the toilet and bathtub matched defendant's profile. 327 Ill. App. 3d at 123-24. The appellate court noted that, had Boicken simply testified that the DNA profile of blood found on the toilet and bathtub matched defendant's DNA profile, "without mentioning the fact that defendant's DNA profile was stored in a database administered out of Springfield, we would not find his testimony prejudicial." 327 Ill. App. 3d at 124. Further, the appellate court observed:

> "[T]he collection and storage of DNA as a means of identifying individuals is a relatively new process and is not widespread. In the future, as DNA is used for identification of individuals in more and more areas, and as the public becomes generally aware of those uses, a different rule might obtain." 327 Ill. App. 3d at 124.

The State contends that, given the almost six-year time lapse between the crime and the discovery that defendant's DNA had been recovered from the crime scene, and the expanding use of a DNA database as a means to identify an offender, the trial court properly exercised its discretion in denying defendant's motion *in limine*. Allowing Boicken's limited testimony was necessary to explain how defendant came to be identified as the source of the DNA recovered at the crime scene. We agree.

-13-

"Generally speaking, evidentiary motions, such as motions *in limine*, are directed to the trial court's discretion. A trial court's ruling on such motions will not be disturbed on review absent an abuse of that discretion. [Citation.] The threshold for finding an abuse of discretion is high. A trial court will not be found to have abused its discretion with respect to an evidentiary ruling unless it can be said that no reasonable man would take the view adopted by the court. [Citation.] Moreover, even where an abuse of discretion has occurred, it will not warrant reversal of the judgment unless the record indicates the existence of substantial prejudice affecting the outcome of the trial. [Citation.]" *In re Leona W.*, 228 Ill. 2d 439, 460 (2008).

Here, defendant presented a pretrial motion *in limine* to bar any evidence relating to his prior conviction for criminal sexual assault. During argument on the motion, the prosecutor informed the trial court that the State had no intention of introducing any evidence that defendant was a convicted sex offender or that he was required to have his DNA entered into a database because he had a prior conviction. Defendant argued that the State should only be allowed to introduce evidence of the buccal sample taken from defendant after he was arrested, because reference to the "Nicodas [*sic*] Bank" opened the door for the jurors to speculate as to why defendant's DNA was "on record." The prosecutor responded that the time line of how the investigation into Doris Jackson's murder occurred had to be explained to the jury because of the five-year lapse between the initial forensic testing of the blood samples from her apartment in December 1995 and defendant's arrest in August 2001. The State further argued that it needed to explain to the jury how defendant's DNA came to match the samples from the victim's apartment.

In ruling on the motion, the trial court stated:

"Regarding the DNA sample issue, I will allow the State to present the evidence in the matter that it came from a data base, but nothing further. No explanation of how the data base occurred, et cetera. I think it's probably the least offensive way to deal with this issue without stepping on a landmine. If we try to camouflage it regarding voluntariness or things of that nature, we're only seeking trouble. Simply

a DNA data bank is the least offensive manner, simply like fingerprints, non-convicted people can be part of the data base, it's up to the jurors to make any determinations that they want to but, again, it leaves area on both sides for innocent matters to be presented to a data base versus matters by court order as a result of a conviction."

The defense made no further request that the jury be given any kind of limiting instruction regarding Boicken's testimony, and no mention was made at trial of defendant's prior conviction.

The decision whether to admit evidence cannot be made in isolation and the trial court must consider a number of circumstances that bear on the issue, including questions of reliability and prejudice. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). In this case, our examination of the considerations relevant to the trial court's decision to allow limited reference to the DNA database evidence reveals no abuse of the trial court's discretion. First, this court has held that "[t]he consequential steps in the investigation of a crime are relevant when necessary and important to a full explanation of the State's case to the trier of fact." *People v. Johnson*, 114 Ill. 2d 170, 194 (1986); *People v. Hayes*, 139 Ill. 2d 89, 130 (1990). Here, the evidence showed that the victim's murder went unsolved for almost six years, until an assistant State's Attorney asked Boicken to test the unidentified blood samples recovered from the victim's bathroom. After Boicken discovered that the DNA profiles of blood found on the toilet bowl and bathtub matched defendant's DNA, he was arrested and police obtained a buccal swab from him which confirmed the match. Thus, without Boicken's brief testimony as to how defendant was first identified, so that the buccal swab could be obtained, the jury would have been left with a large time gap and no explanation as to how authorities were able to identify defendant and charge him with the murder six years after it occurred. These circumstances, therefore, weigh in favor of allowing the testimony at issue into evidence.

Indeed, analogous case law relating to the admission of evidence explaining the course of an investigation supports the trial court's exercise of its discretion in this case. In *Hayes*, 139 Ill. 2d at 145, the defendant argued that he was denied a fair trial by the admission of evidence suggesting that he had engaged in prior criminal conduct

-15-

where a detective testified that a witness identified the defendant from a photo book at the "Violent Crimes" police station. This court held that, at most, the testimony may have raised the inference in the jurors' minds that the defendant had a criminal history, but because there was no direct evidence of prior criminal conduct with police, the evidence was not unduly prejudicial. *Hayes*, 139 Ill. 2d at 146.

Later, in *People v. Lewis*, 165 Ill. 2d 305, 345 (1995), the defendant argued that the jury could infer prejudicial prior criminal activity from testimony that his fingerprints were submitted to the FBI in order to locate any records of the defendant in other jurisdictions. At trial, a Chicago police officer testified that he was informed by the FBI that the defendant's fingerprints matched those of a person in custody in California named Louis James Kirk. The officer testified that the California authorities sent him a photograph of Kirk, which the officer determined was a photograph of the defendant, and the defendant was then extradited to Chicago. The trial court in *Lewis*, 165 Ill. 2d at 345, allowed this testimony to demonstrate steps taken in the police investigation despite the defendant's objection that the jury could infer prejudicial prior criminal activity from this evidence.

On review in *Lewis*, this court held:

"[E]vidence which suggests or implies that the defendant has engaged in prior criminal activity should not be admitted unless somehow relevant. The fact that such evidence comes to the jury by way of inference does not alter its potentially prejudicial character. [Citation.] Though incidental and nonspecific in nature, the jury could have inferred from the evidence presented here that defendant had been engaged in prior criminal activity. [Citations.]" *Lewis*, 165 Ill. 2d at 345-46.

However, in light of this court's previous holdings that the steps in the investigation of a crime are relevant when necessary and important to a full explanation of the State's case, and because the evidence was admitted for the purpose of explaining the period between an eyewitness' identification of the assailant and his apprehension, the "other-crimes evidence" was properly presented for a purpose other than to show the defendant's propensity to commit crime. *Lewis*, 165 Ill. 2d at 346.

Additionally, "evidence of other crimes is not admissible merely to show how the investigation unfolded *unless* such evidence is also relevant to specifically connect the defendant with the crimes for which he is being tried." (Emphasis in original.) *Lewis*, 165 Ill. 2d at 346. Applying these considerations to the circumstances present in *Lewis*, this court held that because the jury heard neither direct evidence nor argument at trial about the defendant's previous murder conviction, and because the disclosure was limited to the fact that the defendant was in custody in a facility in California and was extradited to Illinois, the evidence as presented had no tendency to "overpersuade the jury" on the issue of the defendant's guilt. *Lewis*, 165 Ill. 2d at 347. Accordingly, the defendant's claim that he was unduly prejudiced by this evidence was rejected. *Lewis*, 165 Ill. 2d at 347.

Just as in *Lewis*, the "other crimes" testimony at issue here was relevant to specifically connect defendant to the victim's murder. The appellate court found Boicken's testimony regarding the database was cumulative to his testimony that the buccal swab sample matched the samples recovered from the crime scene. 327 Ill. App. 3d at 123. However, had the jury only heard Boicken testify that after finding an unidentified DNA profile on August 7, 2001, from the blood recovered in the victim's bathroom on November 2, 1995, he obtained a buccal swab from defendant on November 9, 2001, there would have been confusion and speculation regarding not only what occurred during those respective time lapses, but how the unidentified profile led to defendant. Therefore, the testimony at issue was necessary to demonstrate how defendant came to be identified, arrested and ultimately charged with the victim's murder. By limiting the testimony to the sole fact that an unidentified DNA sample matched defendant's sample from a database, the trial court permitted the necessary explanation of investigative facts to the jury, while precluding any reference to defendant's criminal history. We do not find this ruling to be an abuse of discretion.

Further, as the trial court held, Boicken's testimony regarding the process of identifying defendant's DNA from a database is comparable to the situation where a defendant's fingerprints are similarly identified at trial. In *People v. Jackson*, 304 Ill. App. 3d 883, 894 (1999), the defendant claimed that the trial court erred in

-17-

admitting testimony of an evidence technician who indicated that the defendant's fingerprints were on file with a computer database. The defendant, as here, argued that such testimony improperly implied his involvement in other crimes.

The appellate court in *Jackson*, citing *People v. Hopkins*, 229 Ill. App. 3d 665 (1992), found that a law enforcement officer's isolated and ambiguous statement that he obtained a defendant's fingerprints from a state agency's database does not by itself indicate that the defendant has a criminal background. *Jackson*, 304 Ill. App. 3d at 894. The panel noted that the evidence technician testified that he obtained the defendant's fingerprints from the Automated Fingerprint Identification System (AFIS), a computer database that uses the state's crime lab. He further stated that the AFIS database contains fingerprints of every individual arrested, police officers, and government employees. The technician made no other reference to the source of defendant's fingerprints and the State never mentioned that the defendant had prior arrests or convictions. The trial court found that because of the ambiguity of the technician's testimony, the jury could believe that defendant was a former government employee. Thus, the appellate court held that to infer from this reference to the computer database source of defendant's fingerprints that defendant had a criminal history was "pure speculation," which did not constitute error. *Jackson*, 304 Ill. App. 3d at 895.

Similarly in *Hopkins*, 229 Ill. App. 3d at 674-76, the appellate court found no error in the State's presentation of testimony by a Bloomington police officer that he had compared defendant's fingerprints with fingerprints "from St. Louis County." In addition to noting that the reference was ambiguous, in that it did not indicate that the defendant had a prior criminal record, the *Hopkins* court found it significant that "the testimony in the present case did not even cite a police agency as the source of defendant's fingerprints." *Hopkins*, 229 Ill. App. 3d at 675, 676. The court further stated:

> "Trial courts routinely instruct juries, as happened here, that they 'should consider all the evidence in the light of your own observations and experience in life.' (Illinois Pattern Jury Instructions, Criminal, No. 1.01 (2d ed. 1981).) Surely one of the 'common experiences' in life that many jurors have had or know about is that governmental agencies

-18-

frequently fingerprint persons seeking or obtaining government employment. Accordingly, *** we find defendant's claim that this jury must have concluded that he had a prior criminal record because his fingerprints were on file with 'St. Louis County' to be highly speculative and groundless." *Hopkins*, 229 Ill. App. 3d at 676.

In the present case, we agree with the State that any inference of past criminal wrongdoing from Boicken's testimony was similarly speculative. We note that just as the AFIS database also contains fingerprints of government employees and police officers, the Combined DNA Index System (CODIS) database contains several different indexes, not all of which are criminally based. The CODIS database includes the Forensic Index, containing DNA profiles from crime scene evidence; the Offender Index, containing DNA profiles of individuals convicted of felonies; the Missing Person Index, containing DNA records from individuals that have been reported missing; the Relatives of Missing Person Index, consisting of DNA records from the biological relatives of individuals reported missing; and the Unidentified Human (Remains) Index, containing DNA records from recovered living persons, *e.g.*, children and others who cannot or will not identify themselves, and recovered dead persons whose identities are not known. DNA & CODIS, Division of Forensic Services, Illinois State Police; J. Ashley, *Forensic DNA Evidence: 21st Century Criminal Justice Tool*, Illinois Criminal Justice Information Authority, vol. 5, no. 2 (October 2006). Thus, we find that the appellate court herein erred in distinguishing fingerprint databases from DNA databases "based on the assumption that jurors are generally aware that fingerprints are taken and kept in databases for a variety of reasons unrelated to criminal activity." 372 Ill. App. 3d at 123.

Further, we are unwilling to assume, as defendant does, that the jury had any preconceived notions of the types of persons from whom DNA had been collected and stored for Boicken to reference through the "codus [*sic*] *** [or] data base administrator" in Springfield. In addition to the indexes listed above, the jurors, in the light of their own observations and experiences in life, could also infer that defendant's DNA profile might be contained in a state database for medical reasons, such as transplant recipients, blood

donors or for genetic-testing purposes. Thus, contrary to defendant's contention, the conclusion that the use of the term CODIS in popular crime dramas to refer to the means of identifying suspects from a DNA database, without other information, argument or evidence that the singular source of the DNA was convicted criminals, is completely unwarranted.

We note that courts from other jurisdictions have recognized and approved the use of testimony that a DNA database was used to identify an unknown suspect. In *People v. Meekins*, 34 A.D.3d 843, 828 N.Y.S.2d 83 (2006), *aff'd on other grounds sub nom. People v. Rawlins*, 10 N.Y.3d 136, 884 N.E.2d 1019 (2008), a New York appellate court addressed the defendant's claim that he was unduly prejudiced by the admission of evidence and comments by the prosecutor that his DNA profile was maintained in a computer database. The court held that because of the four-year gap between the offense and the defendant's apprehension, the prosecution's presentation of evidence of the database was reasonably necessary to explain why the defendant was arrested. *Meekins*, 34 A.D.3d at 846, 828 N.Y.S.2d at 86. In opening statements, the prosecutor was not permitted, when referring to the database, to use the term "known individuals" and the jury was instructed not to speculate how or why defendant's DNA profile came to be part of the database. *Meekins*, 34 A.D.3d at 846, 828 N.Y.S.2d at 86. See also *State v. Hunter*, 169 Ohio App. 3d 65, 70, 861 N.E.2d 898, 901-02 (2006) (appellate court found waived, and "inoffensive" statement by the prosecutor that the match to the defendant's DNA came as a result of putting into CODIS, "DNA samples for people who are in other proceedings," and testimony from DNA expert who described the CODIS system as "a repository for storing DNA profiles from various crimes and from some known individuals").

Here, in light of this relatively new and emerging area of the law, where no specific Illinois cases yet existed, we find that the trial court appropriately used its discretion in allowing the brief DNA database testimony. There was no evidence or argument as to whose DNA profiles were contained in the database or how the samples came to be stored therein. Nor was there any suggestion that the database contained only samples from convicted felons, and the jury heard absolutely no evidence or argument concerning defendant's

criminal history. As in *Hopkins*, the testimony in the present case was ambiguous and did not even cite a police agency as the source of defendant's DNA.

Further, defendant herein never requested any type of limiting instruction, as was given in *Meekins*, or asked that the jury be informed of other sources of forensic evidence, as in *Meekins* and *Jackson*. While use of either of these precautions would have negated the inference that the database referred to by Boicken held only DNA from convicted criminals, it appears that defense counsel made a strategic decision to let the testimony stand on its own. Thus, any claim by defendant that the trial court's ruling on his motion *in limine* was insufficient to prevent prejudice rings rather hollow. Here, where Boicken's testimony was necessary to explain the State's case to the jury, relevant to specifically connect defendant with his aunt's murder, and limited to the fact that defendant's DNA profile matched DNA contained in the CODIS database, the evidence as presented had no tendency to "overpersuade the jury" on the issue of the defendant's guilt. *Lewis*, 165 Ill. 2d at 347. Therefore, we hold that, where no prejudicial "other crimes" evidence was presented, the appellate court erred in reversing defendant's conviction and remanding for a new trial.

We now address defendant's contentions on cross-appeal. First, we examine defendant's claim that the trial court erred in denying his motion to quash arrest and suppress statements where the totality of the circumstances known to Detective Rizzi at the time of defendant's initial arrest in 1995 show there was no probable cause to arrest. Additionally, defendant claims that the appellate court's determination that probable cause existed was based, in part, on facts not known to Rizzi at the time of the arrest. While we accord great deference to the trial court's factual findings, and will reverse those findings only if they are against the manifest weight of the evidence, we review *de novo* the court's ultimate ruling on a motion to suppress involving probable cause. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001), citing *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996).

An arrest executed without a warrant is valid only if supported by probable cause. *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986). "Probable cause to arrest exists when the facts known to the

officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *People v. Wear*, 229 Ill. 2d 545, 563-64 (2008), citing *People v. Love*, 199 Ill. 2d 269, 279 (2002). In other words, the existence of probable cause depends upon the totality of the circumstances at the time of the arrest. *Wear*, 229 Ill. 2d at 564, citing *Love*, 199 Ill. 2d at 279. As this court stated in *Love*, " 'In dealing with probable cause, *** we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Love*, 199 Ill. 2d at 279, quoting *Brinegar v. United States*, 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310 (1949); accord *People v. Wright*, 111 Ill. 2d 128, 146 (1985) (probable cause is a practical concept). Thus, whether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt. *Montgomery*, 112 Ill. 2d at 525. "Indeed, probable cause does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false." *Wear*, 229 Ill. 2d at 564, citing *People v. Jones*, 215 Ill. 2d 261, 277 (2005).

In this case, the record from the hearing on defendant's motion to quash shows that the following facts and circumstances were known to Detective Rizzi after his initial interview with defendant during his voluntary appearance at the police station at 1 a.m. on November 3, 1995. On November 2, 1995, around 7 p.m., Rizzi went to the crime scene, viewed the victim's body with its numerous stab wounds and was told that a bloody knife blade was found on the bed in that room, underneath a pillow. Rizzi further noted that the building had a secured front entrance and that there was no forced entry into the victim's apartment. There were blood droplets and smears in the victim's bathroom, and a bloody dollar bill was found lying on the bathroom floor. Upon speaking with Cassandra, the victim's daughter, Rizzi learned that defendant, her cousin and the victim's nephew had been staying with the victim. Rizzi learned that Cassandra had unsuccessfully tried to contact the victim several times that day. Cassandra did not have a key to the victim's apartment, which only the victim and her ex-husband, Cassandra's father Lewis, possessed. Rizzi also learned that Cassandra had

discovered the victim's body sometime after 6 p.m., after getting the maintenance man to let her into the building and the victim's apartment. As the scene was being processed, Rizzi learned that two television sets were missing, no money was found on the victim, and no keys to the victim's apartment could be located.

Rizzi learned from a resident of the building, Kenneth Johnson, that he had seen the victim near the building's recreation room around 7 a.m. that morning, and that he had seen defendant outside the victim's apartment door around 3 p.m. Another resident, Gwen Alexander, told Rizzi that she did not see the victim that morning, as was their norm, but that she did see defendant in the elevator that morning. When Rizzi later spoke with Cassandra at the police station, she told him that defendant was staying with the victim because he had been kicked out of his own family's home. She also stated that defendant was a crack user and that he and the victim would sometimes argue about money. Both Cassandra and Lewis told Rizzi that when the victim had money, she would keep it tucked into her bra strap. Lewis told Rizzi that he last saw the victim alive on November 1, when he took her to cash her public aid check and to pay bills. Lewis was still in possession of his set of keys to the victim's building and apartment.

Rizzi was notified sometime after 1 a.m. that defendant had arrived at the police station and was asking to see him. Rizzi walked to the lobby and asked defendant to come back to the detective division. Defendant was not handcuffed and accompanied Rizzi into an interview room where he was advised of his *Miranda* rights and signed a waiver form. At this time, Rizzi noticed that defendant had cuts on both hands, with most of the cuts to the palm area of defendant's right hand. Rizzi then received a telephone call from the desk clerk in the lobby of the station, telling him that Cassandra had called to say defendant had hidden something in the garbage can near the men's bathroom. Rizzi then found a set of keys inside the garbage can in that bathroom. After making that discovery, Rizzi returned to the interview room and was told by defendant that he had last seen the victim on November 1 around 10 p.m. Defendant stated that he had gone out and returned on November 2, in the late morning or early afternoon and was unable to get into the apartment. Defendant admitted that he knew the victim kept her money in her

-23-

bra strap. At that time, based on his knowledge of the crime scene, the fact that defendant lived with the victim, information about defendant's drug use and arguments with the victim over money, the missing keys, the cuts on defendant's hands, and the recovered keys in the police station bathroom, Rizzi informed defendant that he would be held in custody and defendant was then taken to the lockup.

Defendant testified at the motion hearing that he voluntarily came to the police station to talk about his aunt's murder, and admitted that he used the bathroom in the station before Rizzi came out to get him. He agreed that he was placed in an interview room where he was advised of his rights and signed a waiver form. Defendant testified that he could not recall if he had any cuts on his hands at that time, and that Rizzi never confronted him about the cuts or photographed his hands until the following day. Rather, defendant spoke with Rizzi for about 15 minutes, after which defendant stood up to leave. Defendant testified that when he asked Rizzi if he was free to leave, Rizzi told him to wait because they were going to have to keep him overnight to check out his story. Defendant stated he was then handcuffed and taken to the basement lockup. Defendant testified that he told Rizzi he was not in the victim's apartment on the day of the murder and could not recall telling Rizzi about the last time he had seen his aunt.

At the conclusion of the hearing, the trial court made the following findings of fact: (1) the victim was repeatedly stabbed and her hands were cut, indicating a struggle; (2) a knife was used to stab the victim and a broken blade was found in her bed; (3) there was blood in several places in the apartment, and in the bathroom it appeared someone had tried to clean things up; (4) two television sets were missing; (5) the victim had obtained money a day earlier; (6) no money was found on the victim, who usually kept her cash in her bra strap; (7) the victim had been seen alive in her building on November 2, and defendant was also seen in the building, a secure facility, on the same day; (8) defendant was living with the victim because his family asked him to leave their residence; (9) the victim's daughter had to be let into her mother's apartment because she did not have keys and no keys were found in the victim's apartment; (10) when defendant arrived at the police station and was

signing a waiver of rights form, he had cuts on his hands and palms; and (11) keys were found in the garbage can at the Harvey police station. Given these findings, the trial court concluded that the totality of the circumstances established probable cause for defendant's arrest.

Defendant argues that the totality of the circumstances known to Rizzi at the time of defendant's arrest required further investigation and verification before it could rise to the level of probable cause. However, in *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986), the trial court's finding of probable cause was upheld where, at the time of the defendant's detention, the officers knew that there was no forced entry to the victims' apartments and thus it was likely the victims' knew their attacker, the defendant lived on their property, and the scrapes on the defendant's hands and bloodspatters on his clothes were consistent with signs of struggle in the victims' apartments. Similarly here, Detective Rizzi knew, *inter alia*, at the time he placed defendant into custody, that there was no forced entry into the victim's apartment, that defendant, a crack addict, was living with the victim and the two were seen in the building that day, that the two had argued about money in the past and that the victim had cashed her public aid check the previous day, and that the broken knife and cuts on the palms of defendant's hands were consistent with the signs of struggle manifested by the wounds on the victim's hands and arms. Based on the above, we conclude that there was probable cause to arrest defendant, as a reasonably cautious person would have thought that defendant had committed a crime. See *Wear*, 229 Ill. 2d at 563, 565.

Defendant further contends that the fact that he was subsequently released from custody demonstrates that probable cause was lacking. We agree with the State, however, that it is more likely that charges were initially rejected because the forensic evidence was insufficient at the time to establish that defendant's guilt could be proven beyond a reasonable doubt. Regardless, the fact that defendant was released from custody alters neither the finding of probable cause for the arrest nor the lawfulness of that arrest. See *People v. Hadley*, 179 Ill. App. 3d 152, 155 (1989). Additionally, because probable cause existed for his arrest, the statements defendant made while in custody were admissible against him. Because the facts and

circumstances known to police following defendant's voluntary appearance and interview at the police station established probable cause, the appellate court properly affirmed the denial of defendant's motion to quash arrest and suppress evidence. Finally, defendant claims that the appellate court considered facts not known to Rizzi at the time of defendant's arrest in affirming the trial court. However, we need not determine whether any erroneous information was considered by the appellate court, as we may affirm a lower court's holding for any reason warranted by the record, regardless of the reasons relied on by the lower court. See *People v. Caballero*, 179 Ill. 2d 205, 211 (1997); *People v. Sims*, 167 Ill. 2d 483, 500-01 (1995); *People v. Everette*, 141 Ill. 2d 147, 158-59 (1990).

Next, defendant argues that the evidence presented at trial was insufficient to prove him guilty of first degree murder beyond a reasonable doubt, where the only new evidence obtained by the State, six years after it had initially refused to bring charges against defendant, was two "drops" of defendant's blood found in the apartment where he was living. We disagree.

When a court reviews the sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); *People v. Phillips*, 215 Ill. 2d 554, 569-70 (2005), citing *People v. Collins*, 106 Ill. 2d 237, 261 (1985). This standard of review does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses. *People v. Sutherland*, 155 Ill. 2d 1, 17 (1992), quoting *People v. Campbell*, 146 Ill. 2d 363, 375 (1992). Further, reviewing courts apply this standard regardless of whether the evidence is direct or circumstantial (*Campbell*, 146 Ill. 2d at 374-75), and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction (*People v. Hall*, 194 Ill. 2d 305, 330 (2000)). Thus, the standard of review gives "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. at

319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; *People v. Nitz*, 143 Ill. 2d 82, 95 (1991); *People v. Young*, 128 Ill. 2d 1, 51 (1989).

"The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *Hall*, 194 Ill. 2d at 330. Further, in weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007), quoting *Hall*, 194 Ill. 2d at 332. A reviewing court will not reverse a conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Campbell*, 146 Ill. 2d at 375.

With these considerations in mind, we review the evidence, both direct and circumstantial, which was presented at trial in the light most favorable to the State. Defendant had been living with the victim for several weeks on November 2, 1995, and had access to her apartment, where the murder occurred. The physical evidence showed no forced entry and no signs of a struggle in the front room. Two television sets were missing from the apartment. The victim was seen around 7:30 a.m on November 2 near the recreation room, where she usually had coffee, but did not meet her friend Gwen Alexander later that morning, as was their habit. Defendant was seen that morning letting himself into the building and opening the mailbox between 9 and 10 a.m. Only two building keys, two apartment keys and one mailbox key were issued to each tenant of the victim's building. The victim's ex-husband, Lewis, had one set of keys. The day before, Lewis had taken the victim to cash her public aid check and pay bills, which generally left her with approximately $100 in cash that she usually kept in her bra. Defendant was a crack cocaine addict and was known to have argued with the victim about money in the past. That afternoon, at 3 p.m., the victim's daughter Cassandra was unable to reach the victim at her apartment. At about 3:30, defendant was seen walking away from the victim's apartment. Shortly thereafter, he was seen outside the building asking for a ride and reentering the building, using a

key. At 6 o'clock that evening, the victim was found stabbed to death on her bedroom floor. There was no money on the victim's body and a bloody dollar bill was found in the bathroom. Blood samples and a bloody knife blade were collected from the victim's bedroom and bathroom. Defendant returned to the apartment at 1 a.m. the next day, using a key to enter. When informed that his aunt was murdered, his immediate response was that he "didn't do it." He then voluntarily went to the police station, where he first proceeded to throw a set of keys into a trash can in the lobby bathroom. The keys were recovered and, when later confronted with the keys, defendant denied that they belonged to him. Those keys were subsequently identified by the building's maintenance man as belonging to the victim.

At the police station, defendant gave numerous versions of his whereabouts on November 1 and 2, 1995, but did not admit to killing the victim, although in his last interview with Assistant State's Attorney Cece on November 5, defendant admitted to being at the victim's apartment on the morning of November 2, blacking out and awakening only to find the victim's dead body. He further admitted touching the victim's body and trying to roll her over and then washing off the blood in the bathroom sink. He also admitted changing his clothes, which was supported by the bloody clothing found in the bathroom hamper by the victim's family shortly after the murder. After finding his aunt, defendant did not call for help, but rather went out and "partied" with his friends most of the day and night. Additionally, defendant told his cousin Cassandra around the time of the victim's funeral that he had destroyed an envelope with a bloody palm print on it that Cassandra had found in the victim's bedroom.

Testimony from the medical examiner established that the victim was repeatedly stabbed sometime on the morning of November 2, based on the fact that her bladder was empty, indicating that she did not live very long after urinating. In addition, the only thing inside the victim's stomach was a small amount of brown liquid, which could have been coffee. At the station on November 3 and 4, Detective Rizzi and Cece noticed cuts on defendant's hands, specifically the right palm, and Rizzi took photographs of them. Several years later, the DNA from two swabs of blood found in the

victim's bathroom on the night of her murder were tested and found to match defendant's DNA profile. In particular, the swab matching defendant's DNA which was taken from the rim of the toilet bowl could reasonably indicate that it was left after defendant violently stabbed the victim, breaking the knife and cutting his own hand. Upon learning that the investigation of the victim's murder had been reopened in 2001, defendant called the victim's daughter and stated that "his past [had] come back to haunt him."

Defendant argues that the six-year time lapse between the offense and his re-arrest resulted in lost evidence and police reports which undermined the validity of the jury's verdict. While it is true that several pieces of evidence were lost in the interim between the crime in 1995 and defendant's arrest in 2001, the record shows that the jury was well aware of that fact and was properly instructed as to how it should consider that evidence; *i.e.*, "If you find that the State has allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest." Thus, contrary to defendant's contention, there was substantial circumstantial evidence presented to the jury that, particularly when combined with the presence of defendant's blood found at the crime scene, indicated his guilt. Under the standard of review set forth in *Jackson v. Virginia*, this court must allow all reasonable inferences from the record in favor of the prosecution. *Wheeler*, 226 Ill. 2d at 116-17, quoting *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Given this standard, and while we agree with the appellate court that there was not overwhelming evidence of defendant's guilt presented in this case, we cannot say that, viewing the evidence in the light most favorable to the State, a rational trier of fact could not have found defendant guilty of first degree murder beyond a reasonable doubt. Accordingly, we reject defendant's contention that his conviction should be reversed.

## CONCLUSION

For the reasons stated, we reverse the appellate court's grant of a new trial to defendant, but affirm that court's judgment in all other respects.

*Appellate court judgment reversed*

*in part and affirmed in part.*