2021 IL App (1st) 182111-U

No. 1-18-2111

Order filed April 16, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 3156 |
| | ) | |
| GENE BOYD, | ) | Honorable |
| | ) | Steven J. Goebel, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Mikva and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for aggravated discharge of a firearm is affirmed where the victim's identification of defendant as the gunman was reliable.

¶ 2    Following a bench trial, defendant Gene Boyd was convicted of aggravated discharge of a

firearm (720 ILCS 5/24-1.2(a)(1) (West 2016)) and sentenced to eight years' imprisonment. On

appeal, defendant contends the State failed to prove him guilty beyond a reasonable doubt because

neither the victim's unreliable identification of defendant nor photographs of the offender taken by the victim during the offense established defendant was the offender. We affirm.

¶ 3    Defendant was charged with three counts of attempted first degree murder, two counts of aggravated unlawful use of a weapon (AUUW), and one count each of aggravated discharge of a firearm and unlawful use or possession of a weapon by a felon (UUWF).

¶ 4    At trial, Marcos Acevedo-Bartolo testified through an interpreter that on January 28, 2017, he lived in a one-story house on Appletree Street in Hanover Park with his wife, two children, and cousin. A renter lived in his basement. About 1 a.m., Acevedo-Bartolo was in bed with his wife when he heard someone knocking on the front door. He went to the front door and told his wife, Dionisia Ronquillo, to stay in the hallway. The outside porch light next to the door was on. Acevedo-Bartolo looked out the window next to the door and observed an African American man standing outside. When asked by the prosecutor to describe the man, Acevedo-Bartolo testified "[t]he one that is sitting there" and pointed at defendant, identifying him in court. On the night of the offense, defendant was wearing a red shirt with a red hoodie that had an "Indians, like American football" logo. The hoodie covered defendant's head and top portion of his face. Acevedo-Bartolo could see defendant's face from his eyebrows down, including his eyes. Acevedo-Bartolo was "face-to-face" with defendant "[l]ess than a foot" apart with only the window separating their faces. Defendant was banging on the door and yelling. Acevedo-Bartolo did not understand what defendant said because he does not understand English. Defendant continued banging on the door for about two minutes. Defendant then walked to a black car parked across the street from Acevedo-Bartolo's house. Acevedo-Bartolo observed a "white girl with

blond hair" sitting on the passenger's side of the vehicle. Defendant drove away in the black car. Acevedo-Bartolo and his wife went back to bed.

¶ 5    About five minutes later, defendant returned and began banging on the door even harder. Acevedo-Bartolo returned to the front door holding his phone in his hand with his camera ready. He again told his wife to stay in the hallway. Defendant was "trying to really work on the knob" attempting to open the door. Acevedo-Bartolo held his phone next to the window and took a picture of defendant. Defendant returned to the black vehicle and drove away. Acevedo-Bartolo again observed the blond girl inside the vehicle. Acevedo-Bartolo and his wife returned to bed. They did not call the police at this time because they had never had any problems with anyone. In court, Acevedo-Bartolo identified a photograph of his cell phone displaying the picture he took of the offender and testified, "[t]hat is the black guy that is sitting there."

¶ 6    Acevedo-Bartolo testified that about five minutes later, "he came back and was banging even harder." The prosecutor asked who he was referring to by "he." Acevedo-Bartolo replied, "[t]he black guy that is there," and confirmed he meant defendant. Defendant was banging on the front window. Acevedo-Bartolo stood in front of the window and looked outside. He was less than one foot from defendant. Acevedo-Bartolo took another picture of the offender with his cell phone. In court, Acevedo-Bartolo identified a photograph as the picture he took of defendant the third time defendant came to his house. Acevedo-Bartolo testified that during this third occurrence, defendant held a small revolver in his right hand pointed at the window. Defendant pointed the gun at Acevedo-Bartolo's head. Acevedo-Bartolo heard defendant cock the hammer of the gun and heard the gun click. The gun did not fire. Acevedo-Bartolo moved behind the front door. His wife turned on the kitchen light. Acevedo-Bartolo yelled at her to turn it off and she did. Defendant

then fired a gunshot through the window into Acevedo-Bartolo's house. The bullet struck a corner near the kitchen. Acevedo-Bartolo yelled to his wife to call 911. He remained behind the door and did not see where defendant went. The police arrived at the house and Acevedo-Bartolo told them what happened. He showed the police the pictures he took on his cell phone. Acevedo-Bartolo testified that defendant was the person he saw at his door during each of the three encounters. He also observed the same black vehicle during each occurrence. The porch light was on throughout the entire incident. Prior to this incident, Acevedo-Bartolo had never seen defendant.

¶ 7    Acevedo-Bartolo testified that when he viewed a photo array on a computer, he did not identify anyone. On February 3, 2017, he went to the Du Page County jail with Detective Daniel Cortese and met with Deputy Eric Morales, who spoke Spanish. Acevedo-Bartolo viewed a physical lineup and identified defendant as the person who shot at him. When the prosecutor asked Acevedo-Bartolo who he identified, he replied "[t]he black guy that is sitting there." A video recording of the lineup was played in court and admitted into evidence along with a transcript that translated the discussion between Acevedo-Bartolo and Morales from Spanish to English.

¶ 8    This court viewed the video of the lineup and relied on the transcript for the translation to English. The video shows Acevedo-Bartolo and Morales in a darkened room looking through a window into the adjacent room where six men wearing orange jumpsuits are standing in a line with their backs to Acevedo-Bartolo. Morales advises Acevedo-Bartolo that the offender may or may not be in the lineup, that Morales does not know the person who has been charged with the crime or his identity, and that Acevedo-Bartolo should not feel pressured to make an identification. The men in the lineup are directed to turn around and face the glass. Acevedo-Bartolo states, "[i]s number 6," which is defendant. The men are directed to turn to their right. Morales asks, "[s]till?"

Acevedo-Bartolo replies, "yes, yes is number 6." The men are directed to turn to their left. Morales asks, "[i]s it the same?" Acevedo-Bartolo replies, "[y]es the same – same number."

¶ 9     This court also viewed the two photographs of the offender Acevedo-Bartolo took with his cell phone which were admitted into evidence. The photograph taken during the second encounter depicts a close-up partial view of an African American man. The man is wearing a red, black, and white hoodie that appears to have the Chicago Blackhawks Indian logo on the front of it. A portion of the front of the man's neck and the lower left quarter of the man's face were the only features captured. The visible features include half of the man's lips, a portion of his short beard and moustache, and red writing on his neck that appears to be a tattoo. The photograph taken during the third encounter depicts an African American man wearing the same red Blackhawks hoodie. This photo captured from the top of the man's head to his waist. The man's hood is up over the top of his head, but his entire face is visible including his forehead, eyes, eyebrows, nose, mouth, beard, moustache, and left ear. The man is holding his left arm up in front of him, bent at the elbow, with his fingers folded in, as though he were knocking on a window with his knuckles.

¶ 10     On cross-examination, Acevedo-Bartolo testified that he could see the girl inside the black vehicle because the car door was open and the light inside the vehicle was on. During the third encounter, defendant was banging on the window with his left hand. Acevedo-Bartolo heard the gun click from inside his house because defendant had the gun "pointed right to the window." Acevedo-Bartolo was standing about one inch away from the window. He did not see defendant fire the gunshot because he had moved behind the door. Acevedo-Bartolo acknowledged that the gun was not visible in the photographs he took during the offense. Around 5:30 a.m., about four hours after the incident, the police brought Acevedo-Bartolo to the police station and showed him

a photo array of six men. Acevedo-Bartolo testified that he did not identify anyone in the photo array because defendant's photograph was not included. Defense counsel showed Acevedo-Bartolo the photo array in court. Acevedo-Bartolo denied that photograph number three in the photo array was a photograph of defendant, who was sitting in the courtroom. He testified, "I hadn't seen him like that on that date."

¶ 11　On redirect examination, Acevedo-Bartolo testified that he heard the gunshot within seconds after he moved behind the door. The bullet hole in the window was located where Acevedo-Bartolo's face had been seconds earlier. Defendant's right hand, in which he held the gun, was not visible in the photographs. Acevedo-Bartolo confirmed that defendant, the person he identified in court, was the person who came to his door on each of the three occasions.

¶ 12　Similar to Acevedo-Bartolo, his wife, Dionisia Ronquillo, testified through an interpreter that she and her husband were in bed when she heard someone banging loudly on their front door. Ronquillo remained in the hallway while Acevedo-Bartolo looked out the front window. Ronquillo could not see the front door from where she was standing. She heard the man outside the door mention a name, but she could not understand what he said because she does not understand English. She never saw the man who was outside their door. The man left their house but returned three to five minutes later and knocked on their door again. Ronquillo remained in the hallway while Acevedo-Bartolo looked out the window again. The man left their house and Ronquillo and her husband returned to bed. She did not call the police after the second occurrence because she did not want any problems. Three to five minutes later, the man returned to their house and banged on the door again. Acevedo-Bartolo stood by the window and looked outside. Ronquillo entered the kitchen and turned on the light. Her husband yelled at her to turn off the light and she did.

Acevedo-Bartolo then yelled at her to call the police because the man was shooting a gun. Ronquillo called 911 and reported what happened.

¶ 13    On cross-examination, Ronquillo testified that during the incident she never saw anyone in front of their house, never observed any vehicles on the street, and never heard any gunshots. She never saw the bullet inside their house.

¶ 14    The State presented a stipulation that a transcript of Ronquillo's 911 call was a true and accurate translation of what was said during the call. The recording of the 911 call and transcript were admitted into evidence. This court listened to the recording and relied on the transcript for the translation into English. The transcript shows that Ronquillo reported that an African American man had fired a gun into their house, but no one was shot, and the man left their house in a vehicle.

¶ 15    Du Page County sheriff's deputy Eric Morales testified that on February 3, 2017, he assisted Detective Cortese by translating English to Spanish during a lineup at the jail. Cortese did not tell Morales what the case was about or who the suspect was. Morales did not compose the lineup. Defendant was escorted around the jail and selected other men who looked like him to appear with him in the lineup. Morales met with Acevedo-Bartolo and translated the lineup advisory form from English to Spanish. During the lineup, the participants were asked to face forward, turn to the right, and turn to the left. During each of those three views, Acevedo-Bartolo identified person number six as the offender. Morales asked Acevedo-Bartolo if he was certain it was number six, and Acevedo-Bartolo said "yes." In court, Morales identified defendant as the person Acevedo-Bartolo identified as person number six during the lineup.

¶ 16    Hanover Park police officer and evidence technician Juan Gonzalez testified that on January 28, 2017, he went to Acevedo-Bartolo's house to assist as a Spanish interpreter for Officer

Hayes[1] who was responding to a call regarding a man with a gun. Gonzalez observed a bullet entry hole by a large window near the entrance to the house. After translating the conversation between Hayes and Acevedo-Bartolo, Gonzalez recovered a small projectile from behind the front door. The projectile had struck a wall near a kitchen cabinet 12 inches below the ceiling and either bounced towards the door or was kicked there by people walking inside the house. Gonzalez did not find any shell casings at the scene.

¶ 17    Hanover Park police detective Daniel Cortese testified that on January 28, 2017, Acevedo-Bartolo showed him two photos he had taken with his phone of the person who fired a gunshot into his house. After viewing those photos, Cortese comprised a photo array by selecting a photo of defendant from a police database, then selecting photos of other men in the database who looked similar to defendant. Cortese noted that the photo on Acevedo-Bartolo's phone showed defendant with a tattoo. Cortese purposely selected an older photo of defendant to include in the photo array from March 2016 in which he did not have the tattoo. Defendant was arrested on February 1, 2017, and new photos taken of him at that time depicted tattoos of lettering on the front of his neck and lips on the side of his neck. The new photos also showed some scarring on defendant's face.

¶ 18    On cross-examination, Cortese testified that he knew defendant from previous contacts prior to this incident. Acevedo-Bartolo viewed the photo array with Officer Amy Alonzo about four hours after the incident. Defendant was photo number three in the photo array. Acevedo-Bartolo did not identify defendant in the photo array. Cortese acknowledged that the photos taken by Acevedo-Bartolo were slightly blurry. He further acknowledged that defendant's neck was not visible in the photo Acevedo-Bartolo took during the third encounter.

---

[1] Officer Hayes' first name does not appear in the record.

¶ 19     On redirect examination, Cortese testified that after the lineup, Morales told him Acevedo-Bartolo identified person number six. Cortese knew defendant well enough to know he had gotten a new tattoo on his neck since 2016. When Cortese viewed the photos on Acevedo-Bartolo's phone, he believed they were photos of defendant.

¶ 20     The State presented a stipulation that defendant was living at a specific address in Hanover Park at the time of his arrest. The State then rested its case.

¶ 21     Defendant moved for a directed finding arguing that the State failed to prove he was the offender. Before the court ruled on the motion, the State asked to reopen its case to submit a certified copy of defendant's prior felony conviction to satisfy the elements of the UUWF charge. The trial court denied the request. The court noted that the State did not present any evidence that defendant did not have a valid concealed carry license or firearm owner's identification card. The court granted the motion for a directed finding as to the counts of UUWF and AUUW. It denied the motion as to the counts of attempted first degree murder and aggravated discharge of a firearm.

¶ 22     Marisa Garcia testified for the defense that in January 2017 she lived in Hanover Park with her mom, brother, and defendant. Garcia identified defendant in court. At trial, Garcia was 16 years old. Garcia was not related to defendant but had known him for three or four years. Garcia testified that on the night of January 27, she was "most likely" at home watching television by herself near the front door. About 11 p.m., her mom and defendant came home, went in the kitchen, then went upstairs to their bedroom. Her mom helped defendant up the stairs by holding his leg as he scooted up backwards while sitting down. About midnight, Garcia went upstairs to her bedroom and went to bed. The garage was underneath her bedroom. She never heard the garage door open that night, nor did she hear any bedroom doors open and close.

¶ 23    On cross-examination, Garcia acknowledged she did not know what day of the week January 27, 2017, was. She was "pretty sure" she was home at 11 p.m. because it was past her curfew. She did not know what happened while she was asleep. Defendant was able to walk on his own but was "hobbling." Garcia's mom, Mandy Romero, drove a black Ford Fusion. In 2017, Romero drove defendant around because he had been in an accident and had very little feeling in his left arm. Garcia acknowledged two photographs of Romero showed that the bottom portion of her hair was blond, and that was how she looked in 2017. Garcia identified defendant in the two arrest photographs taken of him in February 2017 which depicted the tattoos on his neck.

¶ 24    Defendant presented a printout of the photo array, which was admitted into evidence.

¶ 25    The trial court found that Acevedo-Bartolo's testimony about what occurred was "very credible," while Garcia was "very unsure of her testimony." In regard to Acevedo-Bartolo's identification of defendant, the court stated:

> "He took pictures of the perpetrator. The Court has looked at the pictures and believes it to be by looking at the pictures the defendant. But it isn't just the Court's idea of who it is. He was identified by the victim in this case who did get a good look at him. Even though he had a red hoodie on, there's no question he did not get to see the full head. He did get to see the full face, and that is why it was put in by the State. I believe they asked the detective as to why they put the defendant in a lineup and the officer thought it looked like the defendant as well."

The court noted Acevedo-Bartolo did not identify defendant in the photo array and had testified in court that defendant was not the person in the photo array. The court found that the arrest photo of defendant from 2016, which was used in the photo array, and the arrest photo from 2017 "clearly"

depicted the same person. The court stated, "He does look a little bit different. But to the Court, it is obviously Mr. Boyde [*sic*]. There's no question about it." The court pointed out that, because Acevedo-Bartolo viewed the photo array on a computer rather than paper, the court could not see exactly what he saw. The court found, however, that when Acevedo-Bartolo viewed the physical lineup a few days later, "he did pick out the defendant and he picked him out right away."

¶ 26    The court found that the evidence showed that defendant deliberately shot a gun through the window into the residence because he was angry about something. It further found, however, that defendant had no intent to kill Acevedo-Bartolo. Accordingly, the court found defendant not guilty of the three counts of attempted first degree murder. The court expressly stated that, based on Acevedo-Bartolo's identification of defendant in the lineup, the photos he took, and the other evidence, the State proved defendant guilty beyond a reasonable doubt of aggravated discharge of a firearm. The trial court sentenced defendant as a Class X offender to eight years' imprisonment.

¶ 27    On appeal, defendant contends the State failed to prove him guilty beyond a reasonable doubt because neither Acevedo-Bartolo's unreliable identification of defendant nor the cell phone photos Acevedo-Bartolo took of the offender during the offense established defendant was the offender. Defendant argues that Acevedo-Bartolo's failure to identify him in the photo array hours after the incident renders his subsequent lineup and trial identifications unreliable. He further argues that the photos taken by Acevedo-Bartolo do not prove he is the offender because one photo only shows the offender's face from the bottom of his lip down, and the second photo is too blurry to see the offender's face. In addition, defendant argues that the factors used to assess the reliability of a witness' identification of an offender weigh against finding Acevedo-Bartolo's identification reliable, especially where Acevedo-Bartolo had never seen the offender.

¶ 28    The State responds that the evidence was sufficient to prove defendant guilty where Acevedo-Bartolo made positive and unequivocal identifications of defendant that were reliable, and the photos corroborated the accuracy of those identifications. The State argues that all the identification factors weigh in favor of finding Acevedo-Bartolo's identification reliable. It further asserts that the 2016 photo of defendant used in the photo array in which defendant did not have any tattoos did not accurately depict how defendant appeared on the date of the offense.

¶ 29    When defendant claims the evidence is insufficient to sustain his conviction, this court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proved beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). This standard applies whether the evidence is direct or circumstantial and does not allow this court to substitute its judgment for that of the fact finder on issues involving witness credibility and the weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). Under this standard, all reasonable inferences from the evidence must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 30    In a bench trial, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences from therein. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). In weighing the evidence, the fact finder is not required to disregard the inferences that naturally flow from that evidence, nor must it search for any possible explanation consistent with innocence and raise it to the level of reasonable doubt. *Jackson*, 232 Ill. 2d at 281. We will not reverse a criminal conviction based upon insufficient evidence unless the evidence is so improbable or unsatisfactory that there is reasonable

doubt as to defendant's guilt (*People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011)), nor simply because defendant claims that a witness was not credible or that the evidence was contradictory (*Siguenza-Brito*, 235 Ill. 2d at 228).

¶ 31    To prove defendant guilty of aggravated discharge of a firearm as charged in this case, the State was required to show that he knowingly discharged a firearm at or into the building located at the specific address on Appletree, that he knew or reasonably should have known the building was occupied, and that he discharged the firearm from a place or position outside that building. 720 ILCS 5/24-1.2(a)(1) (West 2016).

¶ 32    Identification of a defendant by a single witness is sufficient to sustain a conviction where the witness viewed the defendant under circumstances that permitted a positive identification. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). Such identification is sufficient even where defendant presents contradictory testimony, as long as the witness had an adequate opportunity to view the offender and provided a positive and credible identification in court. *Id.*

¶ 33    In assessing identification testimony, the court considers: (1) the witness' opportunity to view the offender at the time of the offense; (2) his degree of attention; (3) the accuracy of the witness' prior description of the offender; (4) the witness' level of certainty at the identification confrontation; and (5) the length of time between the offense and the identification confrontation. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995).

¶ 34    Here, viewed in the light most favorable to the State, the record shows that all the factors weigh in support of the trial court's finding that Acevedo-Bartolo's identification of defendant as the man who shot a gun into his house was reliable. Acevedo-Bartolo testified that on the night of the shooting, he observed defendant standing outside his house, yelling and banging on his front

door and window, on three separate occasions, each within five minutes of the next. Defendant was wearing a red hoodie with an Indian logo on the front. Acevedo-Bartolo testified that during each occasion, he was "face-to-face" with defendant "[l]ess than a foot" apart with only the window separating their faces. The outside porch light was on throughout the entire incident, and Acevedo-Bartolo could see defendant's face from his eyebrows down. During the first occurrence, defendant was banging on the door for about two minutes. He then walked to a black vehicle parked across the street where a blond girl was sitting in the passenger seat and drove away. During the second occurrence, defendant tried to open the front door. Acevedo-Bartolo took a photo of defendant with his cell phone, capturing the lower portion of defendant's face. Defendant returned to the black vehicle with the blond girl inside and drove away. During the third occurrence, Acevedo-Bartolo took a photo that captured from the top of defendant's head to his waist with defendant's entire face visible. Defendant held a small revolver in his right hand pointed at the window towards Acevedo-Bartolo's head. Acevedo-Bartolo heard defendant cock the hammer of the gun and heard the gun click, but it did not fire. Acevedo-Bartolo moved behind his front door, and defendant fired a gunshot through the window into the house that struck the wall near a kitchen cabinet. Acevedo-Bartolo's testimony thus established that he was in very close proximity to defendant throughout the offense which gave him more than an ample opportunity to view defendant on each of the three occasions, and his degree of attention was very high.

¶ 35 The record does not indicate whether Acevedo-Bartolo gave police a description of defendant, but instead, reveals that he showed Cortese the two photos he took of defendant during the offense. The photo taken during the second encounter shows the lower portion of defendant's face and his neck with a red tattoo. The photo taken during the third encounter shows defendant

from the top of his head to his waist with all his facial features visible. When Cortese viewed the photos on Acevedo-Bartolo's phone, he believed they were of defendant. The trial court also found that the photos depicted defendant and corroborated Acevedo-Bartolo's identification of defendant. The record therefore shows that the accuracy of the prior descriptive information weighed in favor of finding Acevedo-Bartolo's identification of defendant reliable.

¶ 36    In addition, the record shows that Acevedo-Bartolo's level of certainty at the identification confrontation and the length of time between the offense and his identification of defendant weighed in favor of finding his identification reliable. Five days after the offense, Acevedo-Bartolo identified defendant in a lineup. The video from the lineup shows Acevedo-Bartolo made the identification immediately and without hesitation, and he remained confident in his identification when the lineup participants turned to the left and right.

¶ 37    Moreover, the record shows that Acevedo-Bartolo positively identified defendant in court repeatedly and with absolute certainty. When the prosecutor asked Acevedo-Bartolo to describe the man he observed standing outside his door, he testified, "[t]he one that is sitting there" and pointed at defendant. When asked to identify a photo he took with his phone during the offense, he testified, "[t]hat is the black guy that is sitting there." When asked to clarify who he observed banging on his door during the third occurrence, he replied, "[t]he black guy that is there," and confirmed he was referring to defendant. When asked who he identified in the lineup, he again replied, "[t]he black guy that is sitting there." At the end of his testimony, Acevedo-Bartolo confirmed that defendant, the person whom he identified in court, was the person who came to his door on each of the three occasions during the offense.

¶ 38   Although Acevedo-Bartolo was unable to identify defendant in the photo array, even when shown the photo array in court, the trial court found that did not render his identification of defendant unreliable. Acevedo-Bartolo testified, "I hadn't seen him like that on that date." The court noted that defendant looked "a little bit different" in his 2016 and 2017 arrest photos and questioned whether the fact that defendant viewed the photo array on a computer affected his observation. Nevertheless, the court found that when Acevedo-Bartolo viewed the physical lineup a few days later, "he did pick out the defendant and he picked him out right away."

¶ 39   It was the trial court's responsibility to weigh all the evidence and determine whether it was sufficient to find that Acevedo-Bartolo positively identified defendant as the offender beyond a reasonable doubt. *Siguenza-Brito*, 235 Ill. 2d at 228. The trial court found Acevedo-Bartolo's testimony "very credible" and his identification of defendant reliable. Based on this record, we find no reason to disturb that determination.

¶ 40   For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 41   Affirmed.