2021 IL App (1st) 192467-U

No. 1-19-2467

Order filed July 16, 2021

SIXTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 11593 |
| | ) | |
| THOMAS PORTER, | ) | Honorable |
| | ) | Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Connors and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for possession of a stolen motor vehicle affirmed where the evidence established the vehicle defendant possessed was the same vehicle stolen from the victim; 10-year extended-term sentence is not excessive.

¶ 2    Following a bench trial, defendant Thomas Porter was convicted of possession of a stolen

motor vehicle (625 ILCS 5/4-103(a)(1) (West 2016)) and sentenced to an extended term of 10

years' imprisonment. On appeal, defendant contends the State failed to prove him guilty beyond a

reasonable doubt because the evidence did not prove the vehicle he possessed was the same vehicle

stolen from the victim. Defendant also contends his sentence is excessive because the trial court failed to give adequate consideration to his youth and drug abuse at the time of the offense and at the time of his prior convictions. We affirm.

¶ 3    Defendant was charged with two counts of aggravated vehicular hijacking, one count of armed robbery, one count of possession of a stolen motor vehicle, and two counts of aggravated unlawful restraint. At trial, Shaakira Sutton testified that about 11:30 p.m. on July 20, 2017, she requested a Lyft ride to pick her up from her friend's apartment building near the intersection of 62nd Place and Washtenaw Avenue. Shortly before midnight, Sutton received a notification that her ride had arrived. As Sutton exited the building, she looked to her right and observed someone walking down the street. She did not pay attention to that person because she was talking on her phone. Sutton approached the Lyft vehicle which was parked along the curb directly in front of the building. Sutton checked to make sure it was the correct vehicle and entered the rear passenger door. It was a four-door vehicle. She could not recall the make or model. The Lyft driver, later identified as Edgar Martes, confirmed who Sutton was and entered her destination on his phone. Sutton closed the vehicle's door, ended her call, and placed her belongings on the seat to her left.

¶ 4    Sutton looked up and observed a man standing directly in front of the Lyft vehicle with his arm extended out in front of him, pointing a gun into the vehicle. The gunman told Martes not to move the vehicle. Sutton described the gun as "weird" and testified that it did not look like a "usual gun." She did not recall the color of it. The gunman was "medium-tall" with "a haircut," and wore a white T-shirt with dark-colored jeans. The gunman's face was not covered and nothing blocked Sutton's view of him. The gunman walked to the driver's side of the vehicle and opened the door. The gunman pointed the gun at Martes, made him put his head down, asked what he had, and

searched his pockets. Sutton opened the rear passenger door and began to exit the vehicle. The gunman pointed the gun at her and told her to get back inside the vehicle. She complied and closed the door. After taking items from Martes, the gunman told Martes and Sutton to exit the vehicle. They complied and stood on the curb. The gunman directed them to turn around and face away from him. The gunman entered the vehicle, made a left turn, and sped away down Washtenaw.

¶ 5     Sutton returned to her friend's apartment with Martes. She then realized she had left her phone inside the vehicle. Sutton called her cousin and asked her to track her phone using the Find My iPhone app. Martes called the police. When the police arrived, Sutton and Martes told them what happened. Sutton's cousin updated Sutton with the tracking information and Sutton relayed that information to the police. Sutton's cousin then spoke directly with the police and updated them with each location as Sutton's phone was moving.

¶ 6     Sutton left the apartment with the police. In the police vehicle, they continued tracking her phone. They drove to a location near 74th Street and Marshfield Avenue. The police recovered her phone from someone at that location. Sutton identified her phone and unlocked it with her passcode. The phone displayed a photograph of her daughter. The screen on Sutton's phone was cracked. It was not cracked before the carjacking. The police showed Sutton the man who had her phone. Sutton did not recognize him. It was not the same man who had taken the Lyft vehicle.

¶ 7     The police drove Sutton to a second location near 76th and Paulina Streets. In a show-up at that location, Sutton identified the gunman who took the Lyft vehicle, later identified as defendant. Sutton recognized defendant from his height, haircut, and clothes. Sutton also identified a vehicle at that location as Martes' vehicle in which she had been a passenger. The vehicle was pulled over near a curb and the driver's door was open.

¶ 8    In court, Sutton testified that she "maybe" recognized defendant, whom she identified as the person wearing "[t]he DOC uniform," but she was "[n]ot for sure." In court, Sutton testified that six photographs depicted "[t]he Lyft driver's car," and accurately depicted the vehicle she observed near 76th and Paulina.

¶ 9    On cross-examination, Sutton acknowledged she was not certain the gunman's weapon was real, but she did not want to "take that chance." When the gunman was pointing the gun inside the vehicle, Sutton was looking at the gunman more than the gun.

¶ 10    Edgar Martes testified that on July 20, 2017, he was working as a Lyft driver. He "believe[d]" he was driving a Hyundai Elantra that night. The vehicle was a rental from Enterprise through Lyft that had been loaned to him to drive. Shortly before midnight, Martes received a call to pick up a passenger near 62nd and Washtenaw. When he arrived at the location, he pulled over to the curb on 62nd Street. Sutton exited the building and approached his vehicle. As Sutton entered the rear passenger seat of his vehicle, Martes observed a man walking northbound on Washtenaw. The man turned left and walked westbound on 62nd Street, away from Martes' vehicle. The man walked between some vehicles and Martes lost sight of him.

¶ 11    As Martes began driving, the man "popped out" in front of Martes' vehicle. Martes stopped his vehicle in the middle of the intersection because he did not want to run over the man. The man ran towards the front hood of Martes' vehicle. The man had his arm raised in front of him holding a gun. Martes described the gun as "unusual" with a large barrel. It was "probably grayish," but Martes could not tell. It was not a revolver or "common" semiautomatic weapon. When asked if he believed the weapon was an actual gun, Martes replied that he did not want to "take the chance." The man pointed the gun directly in Martes' face through the vehicle's window the entire time.

The man appeared to be trying to block his face. Martes glanced up and down at the gunman but was not able to get a good look at his face. The gunman was wearing a white shirt and blue jeans.

¶ 12    The gunman approached the driver's side of Martes' vehicle and yelled at Martes to give him all his "stuff." As Martes opened his driver's door, the gunman opened the door the rest of the way while pointing the barrel of the gun in Martes' face. As Martes exited his vehicle, he threw some cash towards the seat. Martes walked to the rear of his vehicle. The gunman entered Martes' vehicle and drove away heading southbound. Martes had his back to the gunman most of the time. When Martes turned around he only saw the gunman's back as he entered Martes' vehicle.

¶ 13    Martes entered a residence with Sutton and called the police. Martes still had his phone in his hand. The police arrived and Martes and Sutton told them what happened. Sutton told the police she left her phone inside the vehicle. Shortly thereafter, the police drove Martes to an area near 74th and Marshfield. During a show-up at that location, Martes viewed a man but was not sure if it was the gunman. In court, Martes viewed six photographs and testified that they depicted "the vehicle I was driving that was taken from me."

¶ 14    On cross-examination, Martes acknowledged he was not certain the gun was real.

¶ 15    Chicago police officer Craig Lancaster testified that about 12:20 a.m. on July 21, 2017, he was on patrol in a marked police vehicle with his partner, Officer Wells,[1] near 76th and Paulina Streets when they received a radio call regarding a vehicular hijacking in the area. The subject vehicle was a dark blue Hyundai Elantra with Illinois license plate number E496914. Lancaster observed a vehicle matching that description drive past them and turn southbound onto Paulina from 76th Street. The officers turned and followed directly behind the Hyundai. The Hyundai

_____

[1] Officer Wells' first name does not appear in the record.

stopped in the middle of the block and pulled into the first available empty parking space. The officers pulled up directly behind the Hyundai at an angle. The Hyundai immediately went into reverse. The rear passenger corner of the Hyundai struck the front driver's side corner of the police vehicle. The driver jumped out of the Hyundai and fled on foot. In court, Lancaster identified defendant as the driver of the Hyundai.

¶ 16    Lancaster exited the police vehicle and chased after defendant. As they ran and turned on several streets, Lancaster reported his locations over the radio. Several officers responded to the call. A police vehicle pulled alongside Lancaster, and Lancaster pointed in defendant's direction. When defendant ran through a gangway, Lancaster lost sight of him. As Lancaster returned to Paulina, he heard over the radio that defendant was in custody. Lancaster arrived at an address in the 7600 block of South Paulina and observed that other officers had defendant in custody. At the scene, Lancaster identified defendant as the man he saw exit the driver's side of the blue Hyundai and flee from the vehicle.

¶ 17    In court, Lancaster testified that six photographs depicted "the same vehicle that was used in the vehicular hijacking and the same vehicle that the defendant jumped out of." Lancaster pointed out that the fifth photograph, which depicted the rear of the Hyundai, showed a white mark on the passenger's side of the bumper which was a transfer mark from the police vehicle.

¶ 18    The State's six photographs were admitted into evidence without objection. This court viewed the photographs which depict different angles of a blue Hyundai Elantra parked about two feet from a curb. The vehicle has four doors. The first photograph is a front view of the vehicle depicting the hood and windshield. There is an oval-shaped "lyft" sign on the lower corner of the passenger's side of the windshield. The fourth and fifth photographs depict the rear of the vehicle

with Illinois license plate number "E49 6914". The fifth photograph shows white scrape markings on the passenger's side of the rear bumper as identified by Lancaster, and a blue and white airplane sticker on the passenger's side of the rear windshield.

¶ 19    Defendant moved for a directed finding arguing that Martes never identified the offender and Sutton failed to make an in-court identification. Defense counsel acknowledged defendant was caught in possession of the vehicle but argued there was no evidence as to how or when he came into possession. Nor was there any evidence a gun was recovered. In response, the State argued that Sutton identified defendant at the scene as the man who had taken the Lyft vehicle. In reply, defense counsel argued that Sutton's show-up at the scene was highly suggestive.

¶ 20    The trial court granted defendant's motion for a directed finding as to the two counts of aggravated vehicular hijacking and two counts of aggravated unlawful restraint, noting that Martes and Sutton were not certain the gun was real. The court denied the motion for the lesser include offense of vehicular hijacking. The court also granted a directed finding as to the charge of armed robbery but denied the motion for the lesser included offense of robbery. The court denied the motion for the charge of possession of a stolen motor vehicle.

¶ 21    Following closing arguments, the trial court found the evidence established defendant knowingly possessed a stolen motor vehicle where Sutton identified defendant within 30 minutes of the vehicle being stolen, defendant was found in possession of the vehicle within those 30 minutes, and he fled from the vehicle. Accordingly, the trial court found defendant guilty of possession of a stolen motor vehicle. The court pointed out that no gun was recovered and found defendant not guilty of all the remaining charges.

¶ 22    At sentencing, the State amended the presentence investigation report (PSI) by adding a missing 2011 conviction for armed robbery with a firearm to which defendant pled guilty and was sentenced to 10 years' imprisonment. The PSI indicates defendant had three prior adult felony convictions: two separate convictions for armed robbery with a firearm in 2011 for which he was sentenced to concurrent terms of 10 years' imprisonment, and a 2012 conviction for aggravated battery of a government official/employee for which he served 3 years' imprisonment. Defendant was also found guilty in six juvenile cases: retail theft in 2007; possession of a controlled substance, theft, and aggravated battery in three separate cases in 2008; a second aggravated battery case in 2008 for which he was sentenced to 18 months of probation; and a 2009 case charging him with resisting/obstructing a police officer and reckless conduct for which he was sentenced to 30 days in the Juvenile Temporary Detention Center. The PSI indicates defendant obtained his GED in 2015 while in prison, and that he was employed at McDonalds for six months and lost that job when he became incarcerated in this case. Defendant also reported that he began abusing marijuana when he was 15 and smoked approximately 10 "blunts" a day.

¶ 23    In aggravation, the State argued that defendant was subject to an extended-term sentence based on his criminal background and the facts in this case.

¶ 24    In mitigation, defense counsel argued that defendant was "very young" when he committed the prior offenses, either 15 or 16 years old, and that one of his adult convictions was the result of an automatic transfer. Counsel argued, "[i]t's pretty well established people of that age do not have a fully developed mind and oftentimes will make irrational decisions based on that, Judge." Counsel argued that the court should not impose an extended sentence because it would be based on a crime that occurred when defendant was "a child basically, a kid."

¶ 25     In allocution, defendant stated that he was young at the time of his prior offenses, that he "didn't know nothing about anything," and that he made "horrible decisions." Defendant stated that he graduated, was returning to school and doing what he was supposed to do, and was moving to Peoria to start a new life. He stated that he never wanted to see "this place" again.

¶ 26     The trial court noted, in aggravation, that defendant had a lengthy criminal record starting from when he was a juvenile and continuing as an adult. The court found the sentence was "necessary for the protection of the public." It further stated the sentence was "necessary for the rehabilitation of the defendant, should such a thing be possible, although I have great questions about that quite frankly." In mitigation, the court noted defendant maintained a good relationship with his daughters and family and had some family support. It further noted defendant obtained his GED while in custody and was working at the time of the offense until he lost his job. The court expressly stated that it considered the statutory factors in aggravation and mitigation, defendant's character and background, and the evidence at trial. The court concluded that an extended-term sentence was appropriate, and sentenced defendant to 10 years' imprisonment.

¶ 27     Defendant immediately filed a written motion to reconsider the sentence arguing, *inter alia*, that the 10-year sentence was excessive considering his background and the nature of his participation in the offense. The trial court denied the motion.

¶ 28     On appeal, defendant first contends the State failed to prove him guilty beyond a reasonable doubt because the evidence did not prove the vehicle he possessed was the same vehicle stolen from Martes. Defendant argues that the State presented no testimony from Martes or other evidence regarding the title, registration, vehicle identification number (VIN), or license plate number of Martes' vehicle. He further argues that Sutton did not testify regarding the make, model,

color, or license plate number of Martes' vehicle. Nor did the State introduce any vehicle records from Lyft. Defendant claims the only evidence of the vehicle's license plate number came from Lancaster's testimony, which was hearsay. Defendant points out Martes testified he "believe[d]" he was driving a Hyundai Elantra that night, and claims Martes was uncertain about what vehicle he was driving. Defendant asserts the State only proved he was in a vehicle that looked similar to the one taken from Martes.

¶ 29     The State responds that the evidence established defendant possessed the same vehicle stolen from Martes where Martes and Sutton identified photographs of the subject vehicle as Martes' vehicle, and Lancaster testified the photos were of the same vehicle he observed in defendant's possession. The State points out the police found defendant in possession of the vehicle within 30 minutes after it was stolen from Martes.

¶ 30     When defendant claims the evidence is insufficient to sustain his conviction, this court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proved beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). This standard applies whether the evidence is direct or circumstantial, and does not allow this court to substitute its judgment for that of the fact finder on issues involving witness credibility and the weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). Under this standard, all reasonable inferences from the evidence must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 31     In a bench trial, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences

from therein. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). In weighing the evidence, the fact finder is not required to disregard the inferences that naturally flow from that evidence, nor must it search for any possible explanation consistent with innocence and raise it to the level of reasonable doubt. *Jackson*, 232 Ill. 2d at 281. We will not reverse a criminal conviction based upon insufficient evidence unless the evidence is so improbable or unsatisfactory that there is reasonable doubt as to defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011).

¶ 32    To prove defendant guilty of possession of a stolen motor vehicle in this case, the State was required to show that he was in possession of Martes' 2016 Hyundai Elantra, knowing it was stolen or converted, and he was not entitled to possession of the vehicle. 625 ILCS 5/4-103(a)(1) (West 2016)). The State is not required to prove ownership of a stolen vehicle, but instead, must show that someone other than defendant had a superior interest in the vehicle specified in the indictment. *People v. Smith*, 226 Ill. App. 3d 433, 438 (1992). This element may be established by circumstantial evidence and reasonable inferences drawn therefrom. *People v. Fernandez*, 204 Ill. App. 3d 105, 109 (1990). When evidence of ownership is used to prove the vehicle was stolen, evidence that defendant possessed the same vehicle owned by the victim is required. *People v. Frazier*, 2016 IL App (1st) 140911, ¶ 18 (citing *Smith*, 226 Ill. App. 3d at 438). Evidence that establishes only the make and model of a stolen vehicle, without more, is insufficient to prove ownership. *People v. Walker*, 193 Ill. App. 3d 277, 279 (1990). Absent proof of ownership, the State may present chain of custody evidence linking the vehicle found in defendant's possession to the vehicle named in the indictment, which may form the basis for a proper inference of identification. *Smith*, 226 Ill. App. 3d at 438.

¶ 33     Here, viewed in the light most favorable to the State, the record reveals the combined testimony from Martes, Sutton, and Lancaster was sufficient for the trial court to find defendant possessed the same vehicle stolen from Martes half an hour earlier. The indictment specified that the stolen vehicle was a 2016 Hyundai Elantra that was the property of Martes. Martes testified that on the night of the offense, he was working as a Lyft driver driving a Hyundai Elantra that was a rental vehicle loaned to him through Lyft. Although Martes did not testify to any details regarding the vehicle, he identified six photographs in court as "the vehicle I was driving that was taken from me." Sutton testified that she entered Martes' Lyft vehicle shortly before midnight. She described it as a four-door vehicle. Approximately half an hour later, the police took Sutton to 76th and Paulina where she identified defendant as the gunman who took the Lyft vehicle and identified a vehicle parked near a curb as Martes' vehicle in which she had been a passenger. Sutton also identified the six photographs in court as "[t]he Lyft driver's car" and testified that they accurately depicted the vehicle she observed at 76th and Paulina.

¶ 34     In addition, Lancaster testified that about 12:20 a.m., he received a radio call regarding a vehicular hijacking of a dark blue Hyundai Elantra with Illinois license plate number E496914. He and his partner observed a vehicle matching that description drive past them and followed the vehicle. Moments later the vehicle stopped. When the officers pulled up behind the Hyundai, that vehicle went into reverse and struck their vehicle. Lancaster observed defendant jump out of the Hyundai and flee on foot. Lancaster identified the six photographs in court as "the same vehicle that was used in the vehicular hijacking and the same vehicle that the defendant jumped out of." He identified a white mark on the rear bumper of the Hyundai as a transfer mark that occurred when it struck the police vehicle.

¶ 35    The photographs identified by Martes, Sutton, and Lancaster depict a blue, four-door, Hyundai Elantra parked about two feet from a curb. There is an oval-shaped "lyft" sign on the front windshield indicating it is a Lyft vehicle, and a blue and white airplane sticker on the rear windshield. From these photographs, Martes and Sutton positively identified this particular vehicle as Martes' vehicle, and Lancaster identified it as the vehicle defendant was driving and from which he fled. Based on the testimony from the three witnesses coupled with the photographs, the evidence was sufficient for the trial court to find that defendant possessed the same vehicle stolen from Martes. *Frazier*, 2016 IL App (1st) 140911, ¶ 18; *Smith*, 226 Ill. App. 3d at 438. Accordingly, defendant was proven guilty beyond a reasonable doubt of possession of a stolen motor vehicle.

¶ 36    Defendant next contends his 10-year extended-term sentence is excessive because the trial court failed to give adequate consideration to his youth and drug abuse at the time of the offense and at the time of his prior convictions. Defendant acknowledges he was eligible for an extended-term sentence based on his prior adult conviction. He argues, however, that the court failed to consider that his juvenile offenses occurred before he was 16 years old. He further claims the court failed to weigh other factors in mitigation, including his potential for rehabilitation and that he was convicted of a nonviolent offense. Defendant asks this court to reduce his sentence or vacate it and remand his case for resentencing.

¶ 37    The State responds that defendant has forfeited the issue for appeal because he did not object to the sentence at the sentencing hearing and his motion to reconsider the sentence did not raise these specific arguments. Alternatively, the State asserts that defendant's sentence is proper where the trial court considered all the factors in aggravation and mitigation and imposed a term within the statutory range that was proportionate to defendant's criminal history and the offense.

¶ 38    To preserve a sentencing error for appellate review, both a contemporaneous objection during the sentencing hearing and a written postsentencing motion raising the issue are required. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Here, the record shows that defendant filed a motion to reconsider his sentence immediately after it was imposed. In that motion, defendant asserted, *inter alia*, that his 10-year sentence was excessive considering his background and the nature of his participation in the offense. During the sentencing hearing, defense counsel and defendant emphasized that defendant was only 15 or 16 years old at the time of his prior offenses. Accordingly, we find that, although defendant did not specifically delineate the claim in his written motion that his sentence was excessive based on his age and drug abuse, he sufficiently apprised the trial court of his objection to his sentence, and therefore, the issue is not forfeited. *People v. Latto*, 304 Ill. App. 3d 791, 804 (1999).

¶ 39    Possession of a stolen motor vehicle is a Class 2 felony with a normal sentencing range of 3 to 7 years' imprisonment and an extended range of 7 to 14 years' imprisonment. 625 ILCS 5/4-103(b) (West 2016); 730 ILCS 5/5-4.5-35(a) (West 2016). The trial court has broad discretion in imposing an appropriate sentence, and where, as here, that sentence falls within the statutory range, it will not be disturbed on review absent an abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). An abuse of discretion exists where a sentence is at great variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 40    The Illinois Constitution mandates criminal penalties be determined according to the seriousness of the offense, and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Ligon*, 2016 IL 118023, ¶ 10. In light of these objectives,

"[t]he trial court is charged with fashioning a sentence based upon the particular circumstances of the individual case, including the nature of the offense and the character of the defendant." *People v. Fern*, 189 Ill. 2d 48, 55 (1999). The court's sentencing decision is entitled to great deference because, having observed the defendant and the proceedings, it had the opportunity to weigh defendant's demeanor, credibility, general moral character, mentality, habits, social environment, and age. *Alexander*, 239 Ill. 2d at 213. "The sentencing judge is to consider 'all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding.' " *Fern*, 189 Ill. 2d at 55 (quoting *People v Barrow*, 133 Ill. 2d 226, 281 (1989)). The trial court need not give defendant's potential for rehabilitation greater weight than the seriousness of the offense. *People v. Anderson*, 325 Ill. App. 3d 624, 637 (2001). In addition, when the trial court determines that a more severe sentence is warranted, defendant's age has little import. *People v. Rivera*, 212 Ill. App. 3d 519, 526 (1991).

¶ 41    Here, we find no abuse of discretion by the trial court in sentencing defendant to an extended term of 10 years' imprisonment, which falls in the middle of the statutory range. The court expressly stated that it considered the statutory factors in aggravation and mitigation, defendant's character and background, and the evidence at trial. The trial court pointed out that defendant had a lengthy criminal record starting from when he was a juvenile and continuing as an adult. The PSI shows defendant's numerous prior convictions, including two convictions for armed robbery with a firearm in 2011 for which he was sentenced to concurrent terms of 10 years' imprisonment, and a 2012 conviction for aggravated battery of a government official/employee. His juvenile history included two additional cases of aggravated battery. The trial court expressly stated that the 10-year sentence was "necessary for the protection of the public." It further stated

the sentence was "necessary for the rehabilitation of the defendant, should such a thing be possible, although I have great questions about that quite frankly." The record thus shows the court considered defendant's potential for rehabilitation but had doubts if he could be rehabilitated.

¶ 42    Defendant's argument that the trial court failed to give adequate consideration to his youth and drug abuse at the time of the offense and the time of his prior convictions is unpersuasive. The record shows that defense counsel emphasized that defendant was "very young" when he committed the prior offenses, either 15 or 16 years old, and that one of his adult convictions was the result of an automatic transfer. Counsel argued that people at that age do not have fully developed minds and make irrational decisions. In allocution, defendant also stated that he was young at the time of his prior offenses, that he "didn't know nothing about anything," and that he made "horrible decisions." The PSI indicated that defendant began abusing marijuana when he was 15 and smoked approximately 10 "blunts" a day. The record thereby indicates that the trial court was well aware of defendant's youth and drug abuse but found the 10-year sentence was necessary based on defendant's extensive criminal history, which included violent offenses, in order to protect the public and attempt to rehabilitate defendant.

¶ 43    This court will not reweigh the sentencing factors or substitute our judgment for that of the trial court. *Alexander*, 239 Ill. 2d at 213. Based on the record before us, we cannot say that the sentence imposed by the court is excessive, manifestly disproportionate to the nature of the offense, or that it departs significantly from the intent and purpose of the law. *Fern*, 189 Ill. 2d at 56. Accordingly, we find no basis to disturb the trial court's judgment.

¶ 44    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 45    Affirmed.