2022 IL App (1st) 192199-U

No. 1-19-2199

Order filed Jul 27, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 464 |
| | ) | |
| TEDDY PLUMMER, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant's convictions for aggravated battery with firearm and aggravated discharge of firearm affirmed. Eyewitness testimony that defendant fired gun was credible and corroborated by physical evidence.

¶ 2   Following a bench trial, defendant Teddy Plummer was convicted of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West Supp. 2015)) and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2014)) and sentenced to concurrent terms of 12 years' imprisonment. On appeal, defendant claims the State failed to prove him guilty beyond a

reasonable doubt because the only eyewitness did not provide a credible account of the shooting, and the physical evidence pointed to codefendant DaJuan Armond as the sole shooter. We find no basis to overturn the judgment and affirm.

¶ 3    Defendant and codefendant Armond were jointly indicted on charges of attempted first degree murder, aggravated battery with a firearm, aggravated discharge of a firearm, and aggravated unlawful use of a weapon (AUUW). Defendant was also charged with unlawful use or possession of a weapon by a felon (UUWF). Defendant and Armond had separate trials.

¶ 4    At defendant's trial, Mauricha Lowry testified that early in the morning of December 12, 2015, she was riding in a vehicle with two women, Jara Tramble and Aaliyah Adams, heading to a Wendy's restaurant at 55th Street and the Dan Ryan expressway.[1]

¶ 5    Tramble was driving, Lowry was in the front passenger's seat, and Adams was in the rear seat. While stopped at a red light, Lowry heard numerous gunshots. The three women immediately ducked down inside the vehicle. Lowry could not see where the shots came from. When the shooting stopped, Lowry rose and asked if everyone was okay. Tramble said that she had been shot. Lowry saw blood flowing from Tramble's back. Tramble drove eastbound toward a hospital. At Michigan Avenue, the women observed a police vehicle sitting in a parking lot. Lowry ran to the police vehicle and told the officer Tramble had been shot. The officer called for an ambulance, which transported Tramble to the hospital. No one in Tramble's vehicle had a gun, nor had any of the women been involved in a fight or altercation with anyone prior to the shooting.

---

[1] Lowry did not know Aaliyah's last name. The indictment in the record indicates it is Adams.

¶ 6    Trauma surgeon Dorion Wiley testified that Tramble arrived at Stroger Hospital with two gunshot wounds—an entrance wound near her hip and an exit wound in her back caused by a single bullet. Tramble was treated and released from the hospital shortly after 7 a.m.

¶ 7    Antoine Pennington testified that on the night of December 11, 2015, he attended a "meet and greet" near 54th Place and Union Avenue following a funeral for a friend who had been shot. Defendant and Armond were dropped off at the gathering by separate vehicles. Pennington had known both men for three years. At the gathering, the group discussed being alert for drive-by shooters because that was how their friend had died, and several friends had been shot in the area.

¶ 8    About a half-hour later, defendant and Armond asked Pennington for a ride. They did not give him a destination. Pennington agreed. While they stood on the sidewalk getting ready to enter Pennington's black Nissan Sentra, a vehicle drove past them. Defendant told Pennington, "follow the car." Armond agreed with defendant. Pennington entered the driver's seat, defendant entered the front passenger's seat, and Armond sat in the rear seat on the passenger's side of the vehicle. Pennington followed the vehicle. While driving on Union, defendant told Pennington to pull over. Pennington pulled, over presuming defendant was going to exit the vehicle. Defendant lowered the vehicle's passenger window, drew a gun, and began firing gunshots at the other vehicle. After defendant began shooting, Armond lowered the rear window, drew his own separate gun, and fired gunshots at the other vehicle. Pennington heard about 10 total shots fired from the two guns.

¶ 9    Pennington was overwhelmed, panicked, and did not know what was happening. He did not want any trouble. Pennington pulled away from the curb and made a right turn towards an

alley. As Pennington drove away, defendant and Armond stopped shooting. Pennington was going to drop off defendant and Armond in the same area where he had picked them up. When Pennington returned to 54th Place, his vehicle was surrounded by police. The police ordered Pennington, defendant and Armond to exit the vehicle and placed them in three separate police vehicles. Pennington observed the police recover two guns from his vehicle. One gun was found under his driver's seat and the other was under his baby's car seat, which was in the rear seat of his vehicle where Armond had been sitting. In court, Pennington identified photographs of the two firearms and testified that defendant had fired the SCCY gun and Armond fired the Smith and Wesson gun. Pennington did not observe anyone from the other vehicle return gunfire toward defendant and Armond. He heard gunshots as he drove away from the scene but did not see where they came from. Pennington spoke with detectives at the police station. Neither the police nor the prosecutors promised Pennington that he would not be charged in exchange for his testimony.

¶ 10    On cross-examination, Pennington testified that he drank one beer and smoked one marijuana "blunt" at the gathering. Pennington followed the vehicle for less than a minute before he pulled over and the shooting began. Pennington estimated defendant and Armond each fired four or five gunshots. Armond began firing after defendant stopped firing. Armond placed his gun underneath the child's car seat and placed defendant's gun underneath Pennington's driver's seat. Pennington never touched either of the two guns.

¶ 11    On redirect examination, Pennington testified that he was previously employed as an armed security guard and was licensed to carry a gun for his job. He owned his own gun but was not carrying it with him on the night of the shooting because he was no longer working as a

security guard. Pennington did not know defendant and Armond had guns when they entered his vehicle. After the shooting, defendant passed his gun underneath the front seat to Armond in the rear seat.

¶ 12    Chicago police officer Danielle Hagen testified that about 12:50 a.m. on December 12, she responded to a call of a shooting near Union Avenue and Garfield Boulevard. At the scene, Hagen observed multiple shell casings in the traffic lanes. Traffic was traveling through the intersection at a high rate of speed. Hagen blocked two lanes of traffic on Garfield with her vehicle to try to preserve the evidence. She was unable to stop the traffic going in both directions on Union. Hagen attempted to collect the evidence before it was destroyed. She recovered four shell casings and one fired bullet. She then waited for the evidence technician to arrive to process the rest of the scene.

¶ 13    Chicago police evidence technician Himogenes Del Toro testified that he recovered four nine-millimeter fired cartridge casings from the crime scene on Garfield. These were in addition to the four casings recovered by Hagen. The casings were scattered over a wide-spread area of the road. Del Toro explained that when a casing is expelled from a firearm, it can bounce and "go anywhere," and could be picked up or moved by traffic.

¶ 14    Chicago police officer Salvatore Sammartino testified that about 12:50 a.m. on December 12, he was on patrol in a police vehicle with his partner, Officer Yusuf (whose first name does not appear in the record), around 51st and Halsted Streets when he heard numerous gunshots coming from the south. While driving westbound on 54th Street, Sammartino observed a black Nissan with no headlights on driving directly toward them. The Nissan pulled over to the side of the street. The officers stopped their vehicle in front of the Nissan. Sammartino illuminated the

interior of the Nissan with a flashlight. He observed the driver of the Nissan, Pennington, making movements toward the front seat. The rear passenger, Armond, lifted the base of a child's car seat and made furtive movements underneath. Defendant was sitting in the front passenger's seat. Pennington quickly left the Nissan as the officers left their vehicle. Several backup units arrived at the scene. Defendant, Armond, and Pennington were handcuffed and transported to the police station in separate vehicles. Sammartino later learned that other officers recovered an SCCY firearm from underneath the driver's seat of the Nissan and a Smith and Wesson firearm from under the base of the child's car seat.

¶ 15     Chicago police sergeant Guy Habiak testified that about 12:50 a.m. on December 12, he and his partner, Andy Morgan, were on patrol in a marked police vehicle around 52nd and Halsted Streets when he heard loud gunfire southeast of their location. The officers drove to 54th Street and observed Sammartino and Yusuf engaged in a traffic stop of a black Nissan. Habiak exited his vehicle to assist. He removed Armond from the rear seat of the Nissan and detained him. Habiak then lifted the child's car seat in the rear seat of the Nissan and recovered a two-tone Smith and Wesson nine-millimeter firearm loaded with two live rounds.

¶ 16     Chicago police sergeant Andrew Morgan similarly testified to hearing gunfire and approaching the scene where the Nissan was stopped. After Habiak recovered the firearm from the rear of the Nissan, Morgan searched the rest of the vehicle. Morgan recovered a two-tone, semi-automatic nine-millimeter SCCY handgun from underneath the driver's seat. There were six live rounds in the firearm's magazine and one live round loaded in the chamber.

¶ 17     The State presented a stipulation that forensic scientist Brian Zientek would testify that he analyzed the two recovered firearms and eight fired cartridge casings recovered from the

scene. Zientek determined that all eight of the casings were fired from the Smith and Wesson firearm.

¶ 18    Chicago police detective William Johnson testified that shortly after 12:50 a.m. on December 12, he and his partner, Detective Daniel Burns, arrived at 54th and Halsted Streets, where three men had been arrested and two nine-millimeter handguns were recovered. The detectives proceeded to the intersection of Garfield and Union where they observed four nine-millimeter shell casings on Union Street. Hagen informed them that she had recovered four additional nine-millimeter shell casings and one fired bullet from the westbound lanes of Garfield. Hagen had recovered the casings because the traffic was heavy and would most likely run over the evidence. The detectives remained at the scene until Del Toro arrived and recovered the rest of the casings from the street. They then went to Stroger Hospital and spoke with Tramble, Lowry and Adams.

¶ 19    Upon returning to the police station, Johnson interviewed Pennington, who stated that defendant was the shooter. Armond was a 16-year-old juvenile, and Johnson could not interview him without his mother being present. About 4 a.m., Johnson processed a gunshot residue collection kit on defendant's hands. He also collected defendant's sweatshirt and sent it to the Illinois State Police to be tested for gunshot residue. Johnson explained that gunshot residue should be collected within six hours of the incident. He collected the samples from defendant's hands three hours after the shooting. After collecting the samples from defendant, Johnson interviewed Pennington a second time. Pennington then stated that Armond had also fired a gun.

¶ 20    Forensic scientist Scott Rochowicz testified that he analyzed the gunshot residue kit processed on defendant's hands and found that defendant may not have discharged a firearm, but

if he did, gunshot residue particles were either not deposited, removed by activity, or not detected during the procedure. Rochowicz explained that when someone fires a firearm, gunshot residue may be removed through activity such as rubbing their hands together, placing their hands under running water, or placing their hands inside their pockets. Being handcuffed could interfere with deposited residue when the hands come in contact with clothing or other items. Most gunshot residue is typically removed after two hours simply through normal activity.

¶ 21     Rochowicz also analyzed the cuffs of defendant's sweatshirt. His findings indicated that defendant's left cuff may not have been in the environment of a discharged firearm, but if it was, the particles were either not deposited, removed by activity, or not detected by the procedure. His findings, however, further indicated that defendant's right cuff was in the environment of a discharged firearm or came into contact with an item that had primer gunshot residue particles on it. If a discharged firearm makes contact with clothing, it could leave residue on the clothing. Gunshot residue remains on clothing more often than on a person's skin.

¶ 22     The State provided a stipulation that Chicago police officer Brian Sokniewicz analyzed the two recovered firearms. The Smith and Wesson firearm had the capacity to hold a 16-round magazine and one additional round in the chamber. Three live rounds of ammunition were inventoried with that firearm. The third round had been struck by the firing pin but failed to fire. The SCCY firearm had the capacity to hold a 10-round magazine and one additional round in the chamber. Seven live rounds of ammunition were inventoried with that firearm. The bores of both firearms contained firing residue. Both weapons fired properly.

¶ 23     The State also presented a certified copy of defendant's prior conviction in a 2014 case for aggravated fleeing or attempting to elude a police officer.

¶ 24    The trial court found that the evidence clearly showed that defendant and Armond "were acting in concert" and "decided to go on the offensive" when a vehicle drove by their gathering. The court found that the evidence presented by the State was "credible and corroborated" and established that defendant and Armond both caused multiple gunshots to be fired into the vehicle, injuring Tramble. The trial court found defendant not guilty of attempted first degree murder, but guilty of aggravated battery with a firearm, aggravated discharge of a firearm, AUUW, and UUWF. The court merged the AUUW and UUWF counts into one count of aggravated discharge of a firearm. The trial court sentenced defendant to concurrent terms of 12 years' imprisonment for one count each of aggravated battery with a firearm and aggravated discharge of a firearm.

¶ 25    On appeal, defendant claims the State failed to prove him guilty beyond a reasonable doubt because Pennington's testimony was not credible and was inconsistent with the physical evidence, which indicated Armond was the sole shooter. Defendant asserts that Pennington's claimed ignorance that the shooting was about to occur casts doubt on his entire testimony. Defendant notes that Pennington initially told Detective Johnson that defendant was the sole shooter, then changed his story during the second interview and said defendant and Armond were both shooting. Defendant points out that all eight of the shell casings recovered at the scene were fired from the gun used by Armond and argues that evidence shows Armond was the sole shooter.

¶ 26    When defendant claims the evidence is insufficient to sustain his conviction, this court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proved beyond a reasonable

doubt. *People v. Brown*, 2013 IL 114196, ¶ 48; *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). This standard applies whether the evidence is direct or circumstantial and does not allow this court to substitute its judgment for that of the fact finder on issues involving witness credibility and the weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). Under this standard, all reasonable inferences from the evidence must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 27     In a bench trial, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). In weighing the evidence, the fact finder is not required to disregard the inferences that naturally flow from that evidence, nor must it search for any possible explanation consistent with innocence and raise it to the level of reasonable doubt. *Jackson*, 232 Ill. 2d at 281. We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so improbable or unsatisfactory that there is reasonable doubt as to defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). Nor will we reverse a conviction simply because defendant claims a witness was not credible or that the evidence was contradictory. *Siguenza-Brito*, 235 Ill. 2d at 228.

¶ 28     To prove defendant guilty of aggravated battery with a firearm as charged in this case, the State was required to show that, in committing a battery, he knowingly discharged a firearm, other than a machine gun or a firearm equipped with a silencer, and caused injury to another person—here, that he shot Tramble about the body. 720 ILCS 5/12-3.05(e)(1) (West Supp. 2015). To prove defendant guilty of aggravated discharge of a firearm, the State had to show that

he knowingly discharged a firearm in the direction of a vehicle he knew or should have known was occupied by a person, specifically, Lowry. 720 ILCS 5/24-1.2(a)(2) (West 2014).

¶ 29    Here, viewed in the light most favorable to the State, the record reveals that the evidence was sufficient for the trial court to find that defendant fired gunshots at the vehicle occupied by the three women, which caused injury to Tramble. Pennington testified that defendant told him to follow a vehicle that drove past them while they stood on a sidewalk near 54th Place and Union. After following the vehicle for less than a minute, defendant told Pennington to pull over. Pennington then observed defendant lower the front passenger's window of his vehicle, draw a gun, and fire multiple gunshots at the other vehicle. During the shooting, Pennington was sitting in the driver's seat of his vehicle and defendant was sitting next to him in the front passenger's seat. Pennington testified that after defendant began shooting, Armond lowered the rear window and also began shooting at the other vehicle. Pennington estimated that defendant and Armond each fired four or five gunshots at the other vehicle. After the shooting, Pennington observed defendant pass his gun under the front seat to Armond in the rear seat, then observed Armond place defendant's gun underneath the driver's seat where it was later recovered by police.

¶ 30    In addition to Pennington's testimony, the State presented testimony from Rochowicz, a forensic scientist, who detected gunshot residue on the right cuff of defendant's sweatshirt. The State also presented a stipulation that Officer Sokniewicz found that the SCCY firearm used by defendant had the capacity to hold a 10-round magazine plus one additional round in the chamber, and it contained seven live rounds of ammunition when it was recovered by police. The bore of the firearm contained firing residue. Lowry testified that she was in a vehicle with

Tramble and Adams that was stopped at a red light when she heard numerous gunshots. After the shooting stopped, Tramble stated she had been shot and was bleeding from her back.

¶ 31    The record thus shows that, based on this evidence, the trial court could reasonably conclude that defendant knowingly discharged his firearm in the direction of the vehicle he knew was occupied, which caused injury to Tramble, who sustained gunshot wounds. *Brown*, 2013 IL 114196, ¶ 48.

¶ 32    Defendant's challenge to the credibility of Pennington's testimony is unpersuasive. The trial court expressly found that the evidence presented by the State was "credible and corroborated" and established that defendant and Armond both fired multiple gunshots at the vehicle, causing injury to Tramble. Sitting as the trier of fact, it was the trial court's responsibility to determine whether Pennington's testimony was credible. *Siguenza-Brito*, 235 Ill. 2d at 228. We find no basis to disturb the trial court's determination.

¶ 33    Nor are we persuaded by defendant's claim that the physical evidence indicated Armond was the sole shooter. The record shows that the police recovered eight fired shell casings scattered on the road in the intersection of Garfield and Union. All eight of the casings were fired from the Smith and Wesson firearm used by Armond. However, Officer Hagen testified that when she arrived at the scene after the shooting, traffic was traveling through the intersection at a high rate of speed. Hagen blocked two lanes of traffic on Garfield with her vehicle in an attempt to preserve the evidence on the road. But she was unable to stop the traffic going in both directions on Union. Hagen was concerned that the evidence was going to be destroyed by the traffic. Rather than wait for the evidence technician to arrive, Hagen collected what she could, recovering four shell casings and one fired bullet from the pavement. The evidence technician,

Del Toro, later recovered four additional casings that were scattered over a wide-spread area of the road. Del Toro explained that when casings are ejected from a firearm, they can bounce and "go anywhere," and could be picked up or moved by traffic.

¶ 34     In light of these circumstances, it is possible that casings that ejected from the SCCY firearm used by defendant were moved or pick up by the traffic speeding through the intersection. As discussed above, the combined evidence of Pennington's eyewitness testimony, the gunshot residue on defendant's right cuff, the ammunition capacity of the SCCY firearm, and the firing residue found within the bore of that firearm was sufficient to support the trial court's conclusion that defendant and Armond "were acting in concert" when they both fired gunshots at the vehicle. *Siguenza-Brito*, 235 Ill. 2d at 228.

¶ 35     For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 36     Affirmed.