NOTICE
Decision filed 01/02/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 5240768-U

NO. 5-24-0768

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Piatt County. |
| | ) | |
| v. | ) | No. 22-CF-13 |
| | ) | |
| JACKIE E. FANSLER, | ) | Honorable |
| | ) | Gary A. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Presiding Justice Cates and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Where after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime of intimidation beyond a reasonable doubt, we affirm the defendant's conviction.

¶ 2   On March 28, 2022, the defendant, Jackie E. Fansler, was charged by information with one count of violation of an order of protection with a prior violation (720 ILCS 5/12-3.4(a), (d) (West 2020)), one count of stalking (720 ILCS 5/12-7.3(a-3)(2) (West 2020)), and one count of intimidation (720 ILCS 5/12-6(a)(1) (West 2020)). The charged offenses were alleged to occur between December 31, 2021, and March 11, 2022. On January 9, 2024, a jury trial commenced on all three counts. After testimony, the defendant moved for a directed verdict on all counts; the court granted the directed verdict on count I (violation of an order of protection) and denied the motion on counts II and III. The jury found the defendant not guilty of stalking and guilty of

1

intimidation. The court sentenced him to five years in the Illinois Department of Corrections (IDOC) followed by six months mandatory supervised release (MSR). This appeal followed.

¶ 3                                    I. BACKGROUND

¶ 4     We recite only those facts, based upon jury trial testimony, which are necessary to our disposition. The defendant and Mary D. (Mary) were in a dating relationship, ending around September 2021. Seth Downs, Mary's son, testified that he lived with Mary and his grandmother during the time of the alleged offenses. Seth had known the defendant for approximately 30 years and had seen him drive several vehicles, including both a white Camaro and gold Corvette. Seth testified that on February 6, 2022, he saw the defendant driving a white Corvette [*sic*]. Sometime after February 20, 2022, Seth set up four cameras around the property, and on February 27, 2022, he viewed footage of a gold Corvette driving by his house. On March 1, 2022, Seth stated he woke up in the middle of the night, looked out the window, and saw a car with the headlights off driving by his house. When he left for work that morning, he noticed the distinct odor of paint thinner and "a clear plastic bag laying on the ground. He said that it looked like there was something that had been spilled all over [the] hood of [his] work truck," the truck's paint was changing colors and bubbling, and there was a "white soapy film on [his] windshield." A video was captured of a white Camaro driving past Mary's house, with what looked like something splashing off the hood of Seth's truck as the Camaro passed. On March 9, 2022, Seth and Mary were driving behind a white Camaro that appeared to be going towards their residence. After the Camaro drove past, Seth and officers reviewed camera footage and confirmed that the defendant was the driver of the white Camaro. All pictures and videos were admitted into evidence and published to the jury.

¶ 5     Eric Downs testified that he was Mary's son and had known the defendant since 2015. Eric knew that the defendant had "an early '90's white Camaro" and a " '90's gold [convertible]

2

Corvette." Eric also had set up cameras at Mary's residence sometime after February 20, 2022. He noted that on February 27, 2022, a gold Corvette drove past Mary's house at about noon; on February 28, 2022, a white Camaro drove past her house; on March 8, another suspicious vehicle was captured on video going past Mary's house. This footage was admitted into evidence and published to the jury.

¶ 6     Mary testified that she and the defendant worked together for Day Trucking and were in a dating relationship, which she ended in September 2021. The defendant knew where she lived and that she drove Day Trucking's only blue work truck, which the defendant later identified as the truck he trained Mary to drive. Mary said that the defendant did not handle the breakup well, and in October 2021 he began "harassing" her. The defendant lived across the street from a grain elevator that Mary regularly drove to for her job duties. Mary testified that on October 17, 2021, someone dumped her clean laundry into her yard and rummaged through it, and she noticed that several pairs of her underwear were missing, including a pair of orange checkered underwear. Piatt County deputy sheriff Stewart Williams later testified that on November 5, 2021, law enforcement was dispatched to the defendant's home for reasons unstated. During a search of his residence, officers found a pair of orange checkered underwear in the defendant's nightstand. This item was photographed but never seized.

¶ 7     In November 2021 Mary obtained an order of protection against the defendant in Piatt County case No. 21-OP-116. The trial court admitted the order into evidence, which had been redacted after a prior hearing on the defendant's motion *in limine*. The order directed the defendant not to harass, physically abuse, or stalk Mary and not to interfere with her personal liberty. The order also directed the defendant to stay at least 500 feet from Mary at all times, to avoid communication with her, and prohibited him from being present at Day Trucking. At the time this

order was issued, the defendant was no longer working at Day Trucking. The defendant was served with the order of protection on November 24, 2021, and when served, officers told the defendant that he needed to stay away from Mary's house. The order of protection was valid until November 24, 2023. Regarding the order of protection, the State asked Mary, "What were you afraid the defendant would do to you?" She replied, "At one point, because he was so angry, I was afraid of being hurt, beat up, raped, or harassed."

¶ 8    On December 31, 2021, when working at the grain elevator across from the defendant's residence, Mary noticed the defendant "taking videos or pictures" of her. On January 11, 2022, at the same grain elevator, she saw the defendant "standing out on the porch with his phone taking pictures or videos" again. Mary also testified that the defendant had followed her for some distance after she left the grain elevator in her blue work truck. The defendant was driving his gold Corvette, which had the distinctive louvered headlight that stayed up even when the headlights were off.

¶ 9    On January 28, 2022, Mary was driving her work truck and noticed the defendant's vehicle; later, on her way to another stop, she saw the defendant parked in that same vehicle. When she drove past him, he followed her for approximately 20 miles. After this incident, Mary began to keep a journal to document these events.

¶ 10    Mary testified that on January 31, 2022, while in her work truck on the highway, she noticed the defendant's Corvette, with its one headlight up. She saw the Corvette weaving behind her, in and out of her blind spot and took a picture. Attempting to get the Corvette to back up, Mary tapped her break. In response, the Corvette passed her, and she confirmed the defendant was the driver. The defendant then got in front of her vehicle and slowed down and accelerated interchangeably. Mary again took a picture of the defendant's vehicle.

¶ 11      On February 6, 2022, Mary and Seth were in a vehicle when she saw the defendant's white Camaro driving near her house, and she took a picture. On February 8, 2022, Mary testified that she saw the defendant's white Camaro on the roadway as she pulled into a fuel lot. After fueling the grain truck, 20 minutes later, she saw the Camaro drive past her again. On February 10, 2022, she drove her work truck past an auto body shop, where she noticed the defendant's white Camaro hidden among a lot full of vehicles. He pulled out and followed her. Later that day, the defendant again followed her in the white Camaro. Mary testified that on February 11, 2022, she was again driving her work truck when she saw defendant driving his white Camaro, approaching an intersection. He then followed her for approximately eight miles, turning the opposite direction of her a block away from her house.

¶ 12      On the morning of February 13, 2022, as she was walking outside toward her vehicle, Mary saw a pair of underwear on her windshield, which she recognized as the orange checkered pair missing from her laundry that was dumped into her yard on October 17, 2021. She took a picture of the underwear. She photographed the underwear on the windshield.

¶ 13      Mary testified that on February 15, 2022, she again noticed the defendant following her in his white Camaro. She double-backed to test whether he was following her, and again saw the defendant drive up behind her vehicle. The next morning, February 16, 2022, when Mary went to get in her vehicle, she saw yellow paint had been thrown all over the hood, some splattering onto Seth's truck. Mary testified that a little after 5 a.m. the next morning, February 17, 2022, as she walked out of her house, the white Camaro drove past. Although she did not see the defendant driving then, she saw the defendant driving his Camaro later that day and took a picture. Mary saw the Camaro circle a nearby park and then drive past her house on February 20, 2022. All of the pictures taken by Mary were admitted into evidence and published to the jury.

¶ 14    After Mary testified to the events between December 31, 2021, and March 8, 2022, the following colloquy occurred between the prosecutor and Mary:

"Q: [Mary], going through the dates that you have been talking about today, and what you've been testifying about, is it correct that, at the time of these events you have been testifying about, you were a material witness in a pending criminal case in Piatt County, Illinois?

A: Correct.

Q: These events that you have talked about experiencing, substances on cars at your home, seeing a white Camaro, seeing a white Camaro when you were in your work truck, seeing the defendant drive by, did you believe these events were trying to make you do or not do something?

A: I thought they were trying to stop me from testifying in the case."

¶ 15    Deputy Sheriff Mendez testified that he was on duty March 11, 2022, when he was informed about cars on camera near Mary's house. While driving to Mary's house, Mendez saw defendant's white Camaro, and he made contact with the defendant. The defendant said he was coming back from buying cigarettes, gas, and a mop in a nearby town, Atwood. These items were located in the defendant's car. Mendez then made contact with Mary at her house and reviewed the footage from that day. At 4:04 p.m. that afternoon, the defendant's white Camaro is captured on video. Mendez left Mary's house and went to speak with the defendant. Mendez asked the defendant what streets he took coming from Atwood, and the defendant claimed to have driven down Don Ryan, the main road in Hammond. The defendant never mentioned driving down I Street, the road Mary lives on. Mendez arrested the defendant for a violation of an order of protection.

¶ 16    Mendez testified that he then interviewed the defendant. The defendant said that he allowed someone named "Amanda" to borrow his car that afternoon and that he often allowed people to borrow his cars. He refused to give specific information about these people, stating that it was "impertinent." He said that on that day, March 11, 2022, he had ridden with his cousin, Duanna Green, to a food pantry, and when he returned, his friend had returned his white Camaro. The defendant said that he then drove to the home of Dan and Betty Cole and was there until 4:30 or 5 p.m. When he left, he went to Casey's and Dollar General and bought gas, cigarettes, and a mop. Mendez informed the defendant that Mary's residence had cameras installed, and the defendant said he had not driven past her home since the order of protection was served on him. He could not say for certain if his vehicles had been by Mary's residence, since he lent them out often. Mendez showed the defendant a picture of a male wearing glasses, smoking a cigarette, driving a white Camaro in front of Mary's residence on March 1, 2022, at 3:15 a.m. The defendant said that was not him, that cigarette smokers with glasses drove his car, but also denied knowing who the driver was. The defendant told Mendez to prove the Camaro was his and insisted that he could not be the driver, because he went to bed early that night.

¶ 17    Mendez then showed the defendant a picture of the same Camaro in front of Mary's residence at 4:04 p.m. that day. The defendant conceded that the car looked like his but said that he was not driving it. The defendant could not say how long his trip to the Cole's residence took and did not answer when asked if it was reasonable to believe that he was in possession of the Camaro at 4:04 p.m. that day. Mendez testified that based on the time stamp of the picture, it did not make sense that someone other than the defendant would have been in possession of the Camaro at that time.

¶ 18    Mendez testified that based on his interview of the defendant, he then spoke with the defendant's cousin Duanna Green. Green told Mendez she last saw the defendant on March 11 at 3 p.m. Mendez then checked the Dollar General security footage from 3 p.m. through 4:39 p.m., the time Mendez made contact with the defendant on the roadway. Mendez testified that he did not see anyone resembling the defendant on that security footage.

¶ 19    The State rested, and the defendant moved for a directed verdict on all three counts. Regarding the violation of an order of protection, count III, the defense conceded that everyone involved had believed the order of protection extended to Mary's residence. The defense argued that although the charging instrument had alleged the defendant came within 500 feet of Mary's residence, the protective order itself did not list Mary's home address as a prohibited location. The trial court granted the motion for the directed verdict on count III but denied the motion on count I, stalking and count II, intimidation.

¶ 20    The defendant next testified. He denied taking any pictures or videos of Mary, claiming he steps outside to use his phone because he gets better service on his porch. He admitted driving in the area of Mary's worksite between January and March 2022 but he said he never saw Mary there. He denied pouring any substance on Mary's car or Seth's truck. He testified that he was not the person in the picture driving the Camaro from March 1, 2022.

¶ 21    The defendant admitted that he saw Mary driving her work truck while in his Corvette one day but claimed he only recognized the truck once he was alongside it. He admitted the orange-checkered underwear photographed by deputy Williams was Mary's but said she left them behind when she spent the night when they were dating. He denied placing the underwear on Mary's windshield. He testified that his son, J.R., his son's girlfriend, his friend T.J., T.J.'s girlfriend Brandy, his friend Dan Cole, and Dan's daughter Susan all drove his white Camaro. He said he

8

drove around the area of Mary's house often, visiting a pub, a café, a laundromat, a fish fry, and friends' homes, claiming never to keep surveillance on Mary. He said most of the time he was at those locations, Mary was at work. He denied ever trying to intimidate Mary.

¶ 22    After closing arguments, the jury began deliberations. The jury sent out a question: "Was this the criminal trial that he did not want her to testify in?" During discussion outside the presence of the jury, the State noted that Mary was asked about "a pending criminal case" without identifying the charge in order to avoid prejudice to the defendant. The court and the parties agreed to tell jury that it had "received all the evidence," and the court "could not answer the question." The jury then asked to see two videos, which the court allowed. The first video depicted the "fluid being thrown on [the] car." The second video was during the defendant's police interview when Mendez showed the defendant the photo of the Camaro driving past Mary's residence on March 11, 2022, at 4:04 p.m. The jury returned a guilty verdict on the intimidation charge and a not guilty verdict on the stalking charge.

¶ 23    The defendant filed a posttrial motion, arguing that the evidence was insufficient to convict him of intimidation. The court commented that the jury could have inferred the defendant's criminal intent from his actions, and that the jury apparently found Mary credible. The court further noted that the jury apparently had not found the defendant's denials to be credible and neither had the court. The court stated that there was a picture that, "although blurry, certainly looks like the defendant driving his vehicle." The court denied the defendant's posttrial motion. The defendant was sentenced to five years in IDOC, followed by six months' MSR. The defendant timely appealed.

9

¶ 24                              II. ANALYSIS

¶ 25    The defendant argues that the evidence was insufficient to prove that he was guilty of intimidation beyond a reasonable doubt and asks this Court to reverse his conviction. In a challenge to the sufficiency of the evidence, the reviewing court determines whether; after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). "It is within the province of the jury[, not an appellate court,] to assess the credibility of witnesses, weigh evidence presented, resolve conflicts in evidence, and draw reasonable inferences therefrom, and its determination is entitled great deference." *People v. Douglas*, 2014 IL App (5th) 120155, ¶ 30.

¶ 26    Illinois courts apply the *Jackson v. Virginia* standard regardless of whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to sustain a conviction. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (Internal quotation marks omitted.) *Id.* A jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances; it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the defendant's guilt. *Id.* In weighing the evidence, a jury is not required to disregard inferences flowing normally from the evidence before it, or to search out all possible explanations consistent with innocence and raise them to the status of reasonable doubt. *Id.* A reviewing court only sets aside a conviction if the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of guilt. *Id.*

¶ 27    Consistent with the statute, the jury was instructed that a person commits intimidation when he, with the intent to cause another to perform any act, communicates to the other person directly or indirectly, by any means, a threat to, without lawful authority, inflict physical harm on the person threatened or property. Illinois Pattern Jury Instructions, Criminal, No. 11.41 (approved July 18, 2014). Additionally, the jury was instructed on circumstantial evidence: "Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of [(the) (a)] defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict." Illinois Pattern Jury Instructions, Criminal, No. 3.02 (approved July 18, 2014).

¶ 28    The jury heard testimony from Mary's two sons, Seth and Eric Downs, two police officers, Mary, and the defendant himself. They received 29 exhibits, including photographic and video evidence of vehicles matching the description of the defendant's vehicles; some of these photos showed the face of the driver. Seth and Eric installed security cameras around their mother's property and testified to seeing pictures of the defendant's vehicle, with its distinct broken "louvered headlight" at all hours of the day. Mary testified that she began taking photos when encountering the defendant driving on her work route and described in detail each time she saw the defendant following her between December 31, 2021, and March 11, 2022, citing also to a journal she began after January 28, 2022. Mary also said that she saw the defendant on more than one occasion appear to be taking photos or videos of her while she was working at the grain bin across the street from his house.

¶ 29    The jury heard testimony that yellow paint was thrown on her vehicle, and that after she obtained an order of protection, the defendant began "harassing" her, causing her to be fearful of being "hurt, beat up, raped, or harassed." The jury also heard evidence that Mary's orange

11

checkered underwear, which the defendant admitted were in his possession, wound up being placed on the windshield of Mary's car. The jury also received an exhibit showing these underwear placed on the windshield of Mary's car, with no other explanation of how the underwear got there. Mary stated that all of these incidents made her believe that the defendant was "trying to stop [her] from testifying in the case" where she was a material witness.

¶ 30    The defendant specifically argues there was insufficient evidence to establish that he "directly or indirectly communicate[d] a threat." We disagree. The jury heard ample evidence to support the inference that the defendant's actions were, at least, an indirect threat to prevent Mary from testifying in the "pending criminal case." Mary confirmed that fact during her testimony. Having reviewed the entire record and having considered the evidence in the light most favorable to the prosecution, including all reasonable inferences from that evidence, we find that any rational trier of fact could have found the essential elements of intimidation beyond a reasonable doubt. See *Jackson*, 232 Ill. 2d at 281.

¶ 31                                III. CONCLUSION

¶ 32    For the above reasons, we affirm the defendant's conviction.


¶ 33    Affirmed.